**AgriSTOR LEASING, a Wisconsin Partnership, Plaintiff,**

**v.**

**Lee BERTHOLF and Ruth Alice Bertholf, Defendants.**

**No. 88–1421–K.**

United States District Court, D. Kansas.

Dec. 11, 1990.

Mary E. May Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for plaintiff.

Clifford L. Bertholf, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This matter is before the court on a motion to strike the affidavit of Don Cress and on a motion for summary judgment. Both motions were filed by plaintiff Agri-Stor Leasing (AgriStor).

AgriStor's main contention is that defendants Lee Bertholf and Ruth Alice Bertholf (the Bertholfs), together with Donald Cress and Barbara Cress (the Cresses), entered into a lease agreement (and an addendum thereto) with AgriStor as co-lessees of certain Harvestore grain storage equipment. AgriStor contends that pursuant to the terms of such lease agreement, if payment is not timely received, it is entitled to possession of the equipment and unpaid rent from either the Cresses or the Bertholfs. Since full payment has not been timely received, AgriStor asserts it is entitled to possession of the equipment, payment of the unpaid rent (plus interest), and a reasonable rental fee for the Cresses' continued use of the equipment.

The Bertholfs assert that summary judgment is not appropriate in this case because there are material questions of fact over whether the lease was induced or entered into by the fraud of AgriStor's agent. The Bertholfs alternatively argue that AgriStor ratified the fraudulent representations and itself made such fraudulent representations to induce the Bertholfs to sign the addendum to the lease agreement. In addition, the Bertholfs contend that there are material fact questions over whether the lease is unenforceable because of procedural or substantive unconscionability, mutual mistake, or unilateral mistake where enforcement would cause unjust and undue hardship. The Bertholfs also argue that, given the circumstances of this case, the lease

may be unenforceable against them as accommodation parties.

The court heard oral arguments on November 26, 1990. After hearing arguments, the court informed the parties that it would not strike the affidavit of Don Cress. The court further stated that it would reserve other findings in this matter until it had time to consider all of the arguments and issue formal rulings thereon. The court is now ready to make such rulings. As set forth more fully herein, the court finds that AgriStor's motion for summary judgment should be denied except as to the issues of express agency authority and whether the lease agreement was a true lease.

■ Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable, such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249, 106 S.Ct. at 2510–11.

In considering a motion for summary judgment, this court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). Further, the party moving for summary judgment must demonstrate its entitlement beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985).

■ However, in resisting a motion for summary judgment, the nonmoving party may not rely upon mere allegations, or denials, contained in its pleadings or briefs. Rather, the party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegations. *Burnette v. Dresser Industries, Inc.,* 849 F.2d 1277, 1284 (10th Cir.1988). Moreover, the moving party need not disprove plaintiff's claim, but rather, must only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

■ The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). That is, if on any part of the *prima facie* case there is insufficient evidence to require submission of the case to a jury, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, one of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53.

### Statement of Facts

In their response, the Bertholfs do not specifically controvert plaintiff's statement of uncontroverted facts. Thus, such facts could be deemed admitted for purposes of this summary judgment motion.[1]

---

1. In relevant part, D.Kan. Rule 206(c) provides as follows:

   A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered by paragraph, shall refer

with particularity to those portions of the record upon which the opposing party relies, and if applicable, *shall state the number of movant's fact that is disputed. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.*

However, the Bertholfs do offer their own statement of facts. Since some of those facts are properly supported and are material hereto, in the interest of fairness the court will endeavor to determine the extent to which such facts controvert the plaintiff's statement of uncontroverted facts and the extent to which they establish a genuine issue of material fact.

At relevant times herein, A.O. Smith Corporation owned AgriStor Credit Corporation (AgriStor Credit) and A.O. Smith Harvestore Products, Inc. (Harvestore). Mid–America Harvestore, Inc. (Mid–Am) was a dealer of Harvestore products. Dwight Gwaltney was a salesman for Mid–Am who had worked for many years for several different Harvestore dealers. (Gwaltney Depo., p. 6.)

AgriStor Leasing is a Wisconsin general partnership. It is in the business of leasing farm equipment, especially Harvestores and Slurrystores, to individual farmers. Since AgriStor does not have its own employees, it conducts its business through its general partners, AgriStor Credit and Steiner Financial Services Corporation. AgriStor Credit was in charge of marketing the lease program for AgriStor.

AgriStor had a dealer agreement on leasing with Mid–Am. (Pltf.'s Initial Memo., Kobilan Aff., Ex. A.) That agreement provided that Mid–Am (the dealer) would cause lease agreements to be properly completed and executed by customers desiring to lease Harvestore equipment and would return such completed lease agreements to AgriStor. (*Id.* at beginning paragraph and § B(1).)

In relevant part, Mid–Am also gives the following warranties to AgriStor in the dealer agreement on leasing:

(2) Dealer has not made and will not make any agreements, warranties or representations on behalf of Agristor, and the terms contained in each Lease Agreement constitutes [sic] the only understanding between Agristor and the Lessee named therein in connection with the Equipment.

(3) Each Lease Agreement forwarded to Agristor will be free from set-off or counterclaims of any nature.

(4) All statements contained in each Lease Agreement and in all related documents thereto are and continue to be true, correct and complete.

. . . .

(6) All Equipment subject to a Lease Agreement will be accurately described in such Lease Agreement, and will have been actually delivered to the possession of the Lessee named therein and installed or erected to such Lessee's complete satisfaction.

. . . .

(8) Dealer has no notice of any matters not promptly described to Agristor which might impair the credit of any Lessee.

(Pltf.'s Initial Memo., Kobilan Aff., Ex. A, §§ B(2), (3), (4), (6) & (8).)

In addition, Mid–Am covenants in the dealer agreement on leasing that it will use its best efforts, as AgriStor's agent, to sell any equipment after termination or breach of the lease agreement, and that upon written request it will provide "all labor, equipment, and services reasonably required to dismantle, transport, recondition, resell and rebuild and/or reinstall such Equipment." (*Id.* at § C(1)(a) & (b).)

However, the dealer agreement on leasing does not obligate Mid–Am to obtain financing through AgriStor and does not obligate AgriStor to approve all lease applications received from Mid–Am. (Kobilan Aff., ¶¶ 8 and 9.)

AgriStor held seminars for dealers and dealers' salesmen. At these seminars, AgriStor gave instructions on the terms and provisions of its lease and on the advantages of leasing. (Gwaltney Depo., pp. 41–42.) Dwight Gwaltney, as a salesman for Mid–Am, understood from his attendance at the seminar that AgriStor autho-

---

The statements required by this subsection shall be in addition to the material otherwise required by these rules and the Federal Rules of Civil Procedure.

(Emphasis added).

rized him to tell farmers about the lease option. (Gwaltney Depo., p. 86.)

In addition, AgriStor Credit published and distributed a leasing sales manual to Harvestore dealers and dealers' salesmen. (Gwaltney Depo., Ex. 16.) The manual starts off by advising its readers as follows:

A Harvestore buyer expects competent help from his salesman when making important financial decisions. Leasing can also be an effective closing tool when properly presented. The professional Harvestore salesman needs to understand leasing's benefits relative to his customer's needs, and be prepared to answer any questions or objections the customer may bring up.

(*Id.* at FORWARD.)

The leasing sales manual goes on to give extensive instructions on ways to present the lease option. For example, the manual suggests and instructs salesmen to tell farmers:

AgriStor wants you to know everything possible about its program. They don't believe in surprises or hidden charges.

(Gwaltney Depo., Ex. 16, at SPIII INTEREST PROTECTED 3, ¶ 1.)

Shopping around for money takes time and anymore you usually have to have an appointment or wait. *I can handle everything right here on the farm.*

(*Id.* at SPIV TIMING 2, ¶ 1 (emphasis added).)

The most time consuming part of getting a loan is all the blasted paper work—and it seems everyone wants it their way. *I know what AgriStor needs and I'll help you with it.*

(*Id.* at SPIV TIMING 2, ¶ 3 (emphasis added).)

Furthermore, it is an uncontroverted fact that AgriStor authorized the dealer, and the dealer authorized Dwight Gwaltney, to accept security deposits. (Gwaltney Depo., pp. 61–62.) It is also uncontroverted that AgriStor's only business is providing the capital needed to finance Harvestore products and that such service is offered only to Harvestore customers, exclusively through Harvestore dealers. (Gwaltney Depo., Ex. 16; and at pp. 44–45.)

Moreover, Dwight Gwaltney has testified that he felt that it was part of his job, as a salesman for a Harvestore dealer, to solicit business for AgriStor. (Gwaltney Depo., p. 88.) Plus, the Harvestore Systems 1982 Product Buyers Guide states that:

—Your Harvestore system dealership is also an important source of assistance in financing your purchase. He's likely to be able to help you convince local lenders of your credit worthiness, and *he can offer financing and leases from Agri-Stor Credit Corporation,* the A.O. Smith farm financing subsidiary.

(Gwaltney Depo., Ex. 24, p. 22 (emphasis added).)

Mr. Gwaltney has also testified that in his capacity as a salesman for a Harvestore dealer, he explained how the lease worked and would often go over the lease with the farmer before the farmer signed the lease. (Gwaltney Depo., p. 41.) AgriStor provided Mr. Gwaltney with the lease forms and a chart which gave the applicable rate, given the number of years of the lease. (*Id.* pp. 40–41.)

In addition, Mr. Gwaltney testified that most of the farmers never read the lease and that he did not read the fine print in the lease—he just made sure the amount of payment and the total dollar amount was correct. (*Id.*) Mr. Gwaltney further testified that he could not have told anyone what was in the fine print of the lease because he would have needed a lawyer to be able to do that. (Gwaltney Depo., pp. 50–51.)

It is undisputed that Dwight Gwaltney is the one who explained the AgriStor program to Don Cress. He also gave a partial explanation to Lee Bertholf. With the possible exception of Tom Gray, Gwaltney's supervisor, Mr. Gwaltney was the only person providing information about the silo or the lease to Don Cress or Lee Bertholf. (Gwaltney Depo., p. 36; Cress Aff., ¶ 5.)

Furthermore, Lee Bertholf believed that Gwaltney was the "whole thing" as far as the lease in question was concerned, because he was the only person Lee Bertholf

saw before he signed the contract—he was selling the silo, and he arranged for the financing and construction of the silo. (Bertholf Depo., pp. 41–42.)

Since Gwaltney explained the AgriStor lease as a way to finance the purchase of a Harvestore silo and was the person soliciting the entry into the AgriStor lease, Don Cress believed Mr. Gwaltney represented AgriStor. (Cress Aff., ¶ 1.) In addition, Don Cress alleges that Dwight Gwaltney represented to, and agreed with, him that the equipment could be purchased at the end of the lease term for about 10% of the original purchase price, and that in any event the final purchase price would be no more than one additional lease payment. (Cress Aff., ¶ 2.)

It is uncontroverted that Don Cress and Mid–Am executed two purchase orders dated March 8, 1980. Dwight Gwaltney is listed as the salesman on each of these purchase orders. (Gwaltney Depo., Exs. 13, 14.) The orders were for the purchase of a 25–60 Harvestore silo, a Goliath unloader, an auger, a conveyor, a belt and some bunks. (*Id.*)

Some of the terms of those purchase orders include the following: AgriStor is listed as the "LENDING FACILITY"; a Mid–Am discount on the security deposit of $3,557.20; the terms of payment described as a yearly lease; and receipt by Mid–Am of a "down payment or security deposit in the amount of $3,169.07" was acknowledged. (*Id.*) In addition, Don Cress asserts that on the original purchase order he signed, the name of the "OWNER" (upper lefthand part of Ex. 13 to Gwaltney's Depo.) was not filled in, and that the word "LESSEE" had not been handwritten above the "OPERATOR" line (where his name appears). (Cress Aff., ¶ 3.)

Don Cress paid the security deposit of $3,169.07 to Mid–Am and it was never refunded. Don Cress understood Mid–Am was retaining that amount as a down payment on the equipment purchased. (Cress Aff., ¶ 4.) Such a belief is supported by the fact that the lease agreement states the lease commencement date as April 11, 1980, but that the first annual payment is not due until May, 1, 1981. (L. Bertholf Depo., Ex. 1.)

In a letter dated March 20, 1980, AgriStor informed Mid–Am "that Don Cress's application for *credit* in the amount of $91,-017 does not meet AgriStor Leasing's guidelines for *financing*." (L. Bertholf Depo., Ex. 4 (emphasis added).)

Next, Dwight Gwaltney had Lee Bertholf and Ruth Alice Bertholf fill out an AgriStor financial statement form. (Lee Bertholf Depo., Ex. 3.) Lee Bertholf asserts that he was not aware that he was applying for a lease and that he was not given a copy of this financial statement. (L. Bertholf Aff., ¶ 1.)

A letter dated April 2, 1980, sent by AgriStor Credit to Mid–Am, states that the lease arrangement with Don Cress was approved, and instructs Mid–Am as to the additional documents Mid–Am should procure in order to finalize the agreement. (Gwaltney Depo., Ex. 21.) Some of those necessary documents were as follows: properly completed lease agreements and stipulated loss value sheet, both signed by Mr. & Mrs. Don Cress and Mr. & Mrs. Lee Bertholf; the "Lessee's check for the 7½% security deposit;" acceptance supplement; and a copy of the purchase order. (*Id.*) A copy of this letter was sent to Don Cress, but not to Lee Bertholf. (*Id.*)

In a written lease dated as executed on April 11, 1980, but dated as accepted by AgriStor on April 28, 1980, Donald M. Cress, Barbara L. Cress, Lee Bertholf, and Ruth Alice Bertholf all signed as "LESSEE". (L. Bertholf Depo., Ex. 1.) It should be noted that the lease states that "[u]pon execution of the Lease, lessee shall deposit with Lessor the sum of $6,721.83 as security." (*Id.* at § 2.)

Lee Bertholf asserts that neither Don nor Barbara Cress asked him to sign the above-referenced lease; only Dwight Gwaltney requested that he and his wife sign. (L. Bertholf Aff., ¶ 2.) Mr. Bertholf contends that he was not given an opportunity to read the lease or any other document (such as the purchase order) before he signed the lease. (L. Bertholf Aff., ¶ 3.) He also asserts that he was not given or

even offered a copy of any such documents, and that he was not offered or informed of any options other than the lease document he signed. (*Id.*)

Mr. Bertholf contends that Gwaltney asked him to sign the lease so that the silo could be constructed and going in time for farm needs. (L. Bertholf Depo., p. 15.) Lee Bertholf further contends that he told Gwaltney he didn't want to be obligated to buy a silo, and that Gwaltney said that if it doesn't work for the kids we'll just come and get the silo and that's it. (*Id.*)

Mr. Bertholf asserts that he relied upon such representations by Gwaltney in signing the lease. (L. Bertholf Depo., pp. 25, 28.) Ruth Alice Bertholf has testified that Mr. Bertholf told her to sign the lease, and that if the Cresses cannot pay for the silo, they would come take the silo. (R.A. Bertholf Depo., pp. 7–8.)

In addition, Lee Bertholf thought it was written in the lease that he would not have to pay for the silo and that they would just come and get it if the Cresses could not pay for it. (L. Bertholf Depo., p. 44.) Mr. Bertholf asserts that business in the farming community was customarily conducted orally, with a handshake rather than through written documents, and that if a written document was made, it was customary to accept and rely on oral representations as to the content and effect of the written document. (L. Bertholf Aff., ¶ 4.)

During all of the negotiations and the explanation of the purchase orders and the lease, the parties all spoke of the transaction as the sale of a Harvestore silo. (Cress Aff., ¶ 6; Gwaltney Depo., p. 47.) AgriStor never contacted Don Cress directly until after the lease was signed. Dwight Gwaltney made all arrangements for AgriStor in explaining the lease and obtaining signatures on AgriStor documents. (Cress Aff., ¶ 6.)

Don Cress intended and understood that the lease agreement was a three-party agreement with Mid–America Harvestore as the seller, Don Cress as the buyer, and AgriStor as the financing agency, because the interest rate was lower with a lease. (Cress Aff., ¶ 7; Gwaltney Depo., pp. 24–

25.) Furthermore, Lee Bertholf never realized that a lease was being signed because the discussion was always about selling a silo. (L. Bertholf Depo., p. 16.) Moreover, it is important to note that Dwight Gwaltney believed that all AgriStor did in this leasing deal was to furnish the money. (Gwaltney Depo., p. 78.)

It must also be noted that the lease provides that upon execution of the lease, a security deposit in the amount of $6,721.83 is to be made by the lessees to lessor. (L. Bertholf Depo., Ex. 1, ¶ 1.) However, none of the lessees paid any security deposit to AgriStor. The only security deposit paid by lessees was the $3,169.07 paid by Don Cress to Mid–Am. This portion of the lease was changed by agreement with Dwight Gwaltney. (Cress Aff., ¶ 9; Gwaltney Depo., pp. 58–59.)

The lease does not provide for a final purchase price at the end of the lease term; rather, the lease provides that the purchase price at the end of the lease term is to be equal to the "fair market value" of the equipment. (Bertholf Depo., Ex. 1, ¶ 17.) That provision also states that the fair market value of such equipment is to be determined by agreement between the parties or by appraisal if the parties cannot agree. (*Id.*)

In addition, the lease states that it commences on April 11, 1980; yet the lease was not accepted by AgriStor until April 28, 1980. (Bertholf Depo., Ex. 1.)

Installation (delivery and setup of the silo and equipment) was not explicitly provided for in the purchase orders or the lease. However, Dwight Gwaltney testified that installation was to be provided as part of the lease price because he *told* Don Cress that it was to be part of the agreement. (Gwaltney Depo., pp. 52–53.)

Thus, it appears that the lease agreement, together with the purchase orders, was not intended to be the entire agreement. In fact, Don Cress asserts that he and Dwight Gwaltney specifically agreed that part of the agreement would not be included in writing. (Cress Aff., ¶ 10.)

The original purchase prices (including sales tax) of the silo and automation equipment were, respectively, $75,338.32 and $15,678.00, for a total purchase price of $91,016.32. (Gwaltney Depo., pp. 29, 31; Exs. 13, 14.)

The annual payments pursuant to the lease were $16,162.78. (Gwaltney Depo., Ex. 15.) Don Cress asserts that when he signed the lease, he intended to purchase the silo and automation equipment at the end of the lease term. He also contends that from the beginning he considered the transaction a purchase, with the purchase as provided in the lease being just the final installment of an installment sale. (D. Cress Aff., ¶ 12.) He claims that this belief was based on the fact that Dwight Gwaltney had represented to, and agreed with, him that the final purchase price would be no more than one additional payment. (*Id.*)

At the end of the eight-year lease term, Don Cress would have already paid $129,-056.00, which is $38,039.68 more than the purchase price plus sales tax. Since he believed the silo should last at least 50 years, at the end of the eight-year lease he could obtain 42 more years of service for a maximum of one more payment. Thus, Mr. Cress figured that exercising the purchase option at the end of the lease term would be the only sensible economic option. (Cress Aff., ¶ 12.)

Furthermore, Don Cress asserts that a purchase option limited to one additional payment was an essential factor in his agreeing to the purchase orders and to the lease, since he was paying the full cost of the silo plus considerable interest during the lease term. (Cress Aff., ¶ 13.)

In 1981, Don Cress entered into another AgriStor lease agreement for the purchase of a Harvestore silo and additional equipment. Only Don Cress and Barbara Cress signed on this lease. (D. Cress Aff., ¶ 15.)

In 1982, 1983 and 1984, Don Cress was late on payments on the April 11, 1980 lease. (D. Cress Aff., ¶ 16.) However, Agristor did not give Lee or Mary Alice Bertholf notice of such default or late payment. (L. Bertholf Aff., ¶ 10.)

Don Cress negotiated a final purchase with AgriStor on some equipment subject to AgriStor leases, including some equipment subject to the April 11, 1980 lease. (D. Cress Aff., ¶ 17.) The negotiations were between Don Cress and AgriStor. Lee Bertholf did not participate in the negotiations in any manner. The negotiations were completed by a letter from AgriStor dated February 20, 1985, which accepted Don Cress' offer and set out the terms of the agreement. At this time, neither Lee Bertholf nor Ruth Alice Bertholf had participated in the negotiations, and they did not know that an agreement had been made with Don Cress. (D. Cress Aff., ¶ 17; L. Bertholf Aff., ¶ 5.)

In 1985 Russ Thacker was an employee of AgriStor Credit and an agent for AgriStor. (Pltf.'s Resp. to Defs.' First Req. for Adm., at L.) On March 18, 1985, Russ Thacker came to Kingman, Kansas to carry out the previous agreement between AgriStor and Don Cress. While in Kingman, he requested that Don Cress, Barbara Cress, Lee Bertholf and Ruth Alice Bertholf sign an addendum to the AgriStor lease dated April 11, 1980. This addendum had not been part of the agreement between Don Cress and AgriStor. (D. Cress Aff., ¶ 18.)

The defendants assert that in addition to Russ Thacker, there was another representative from AgriStor in Kingman. They contend that one of the two AgriStor representatives stated that the purpose of the addendum was to get the agreement with Don Cress through the AgriStor office. The defendants further assert that after being asked by one of the AgriStor representatives to sign the addendum, Ruth Alice Bertholf stated that she did not want to sign any papers and she didn't want to buy a blue silo. Defendants contend the AgriStor representative responded by assuring her that they did not have to buy a blue silo. If the young people cannot pay for it, they would come and get it. The Bertholfs assert that they relied on such representations when signing the addendum. (L. Bertholf Depo., pp. 25–27; R. Bertholf Depo., p. 11; D. Cress Aff., ¶ 18.)

Furthermore, it is uncontroverted that neither Lee nor Ruth Alice Bertholf was given a copy of the addendum. (L. Bertholf Aff., ¶ 7.)

It is also uncontroverted that neither Lee nor Ruth Alice Bertholf controlled, used or benefited from the silo or other equipment subject to the AgriStor lease dated April 11, 1980, except that Lee Bertholf operated the equipment a couple of times for Don Cress when Don Cress was away from the farm. (L. Bertholf Aff., ¶ 8.) Moreover, it is uncontroverted that it was clear that the silo was going to be used by and for Don Cress, and that Lee Bertholf was not going to use it. (Gwaltney Depo., p. 21.)

Furthermore, during the entire term of the lease, until suit was filed by AgriStor against the Bertholfs, AgriStor never provided the Bertholfs with a notice of default or a demand for payment. AgriStor never provided a copy of any agreement or document to, or in any way communicated with, the Bertholfs, with the possible exceptions of sending a copy of the February 20, 1985 letter and when the addendum was signed. Likewise, Lee and Ruth Alice Bertholf did not communicate with or pay anything to AgriStor. (L. Bertholf Aff., ¶ 10.)

The first Harvestore silos from the early 1950s are still being used. They have lasted 40 years. They may last 100 years. (Gwaltney Depo., pp. 16–17.)

Don Cress and Barbara Cress filed a Chapter 12 bankruptcy in the U.S. District Court for the District of Kansas on July 7, 1987. *In re Cress*, Bankr. Case No. 87–11854. They have retained the silo pursuant to order of the bankruptcy court. The issue of the silo is still in litigation. (D. Cress Aff., ¶ 21.)

For example, in that bankruptcy proceeding, AgriStor filed a summary judgment motion seeking a determination that the April 11, 1980 lease was a lease and not a disguised financing arrangement. On May 4, 1988, the bankruptcy court found that the lease was, in fact, a lease. *In re Cress*, 106 Bankr. 246 (Bankr.D.Kan.1989). The Cresses appealed the decision to the district court, where it was affirmed by the Honorable Sam A. Crow. *In re Cress*, 106 Bankr. 246 (D.Kan.1989). Thereafter, the Cresses filed a motion to amend the district court's decision. That motion was denied and an appeal was taken. *In re Cress*, No. 88–1311–C, 1989 WL 159390 (D.Kan. Dec. 19, 1989), *appeal docketed*, No. 10–3015 (10th Cir. January 24, 1990).

*Conclusions of Law*

■ The court will first address plaintiff's motion to strike the affidavit of Don Cress. Plaintiff questions the references, in ¶¶ 1 and 2 of the affidavit, to what Dwight Gwaltney allegedly told Don Cress. In addition, plaintiff questions Don Cress' statement in ¶ 18 that an AgriStor agent stated that the Bertholfs would "not have to buy a blue silo. If the young people here can't pay for it, they will come and get it." The plaintiff argues that these statements contain inadmissible hearsay and should be stricken pursuant to Fed.R.Civ.P. 56(e). Such an argument is unconvincing and without merit at this stage of the litigation.

■ Such statements would not be inadmissible hearsay because, at this stage in the litigation, they must be considered an admission by a party-opponent. Fed.R. Evid. 801(b).[2] *See also City of Chanute v. Williams Natural Gas Co.*, 743 F.Supp. 1437, 1447 (D.Kan.1990) ("party admissions are properly allowable in affidavit as an exception to hearsay"). In addition, since the plaintiff does not contend that the questioned affidavit statements were contrary to prior sworn statements by the

---

2. Since this motion attempts to strike the affidavit from consideration for purposes of the summary judgment motion, the court must assume that plaintiff's assertion that Dwight Gwaltney is an agent of AgriStor Leasing is true. Furthermore, Don Cress specifically states in his affidavit that he understood Dwight Gwaltney represented AgriStor Leasing (¶ 1). Thus, since it is clear from ¶ 18 that he was present when the alleged statement was made, such affidavit does comply with Fed.R.Civ.P. 56(e) (is made on personal knowledge, based on facts that would be admissible in evidence, and affirmatively shows affiant is competent to testify to the matters stated therein).

affiant and an attempt to create a sham factual issue, the court should not disregard the affidavit. *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986).

Next, in regard to plaintiff's summary judgment motion, the court must first address the issue of whether Dwight Gwaltney may be considered an agent of AgriStor. Since many of the Bertholfs' defenses depend on Gwaltney being AgriStor's agent, resolution of this issue is key.

AgriStor's main argument is that, on point, precedent precludes a finding that Gwaltney was its agent. *See AgriStor Leasing v. Meuli,* 634 F.Supp. 1208 (D.Kan. 1986); *AgriStor Leasing v. Schmidlin,* 601 F.Supp. 1307 (D.Ore.1985); *AgriStor Leasing v. Kjergaard,* No. 4–83–756 (D.Minn. Mar. 20, 1985) 1985 WL 403; and *CIT Financial Services, Inc. v. Gott,* 5 Kan. App.2d 224, 615 P.2d 774 (1980).

In response, the Bertholfs assert that the cases cited by AgriStor are distinguishable because only a very narrow form of agency (only as to procurement of the lease) is claimed by the Bertholfs in this case. They also contend that there are many key factual issues present in this case which were not present in the cases relied on by AgriStor. As a result, the Bertholfs argue that there are genuine issues of material fact as to whether Dwight Gwaltney had actual authority, either express or implied, or apparent authority, to change the terms of the lease agreement. The court must agree, in part, with the Bertholfs.

The law recognizes two distinct types of agency: actual and ostensible or apparent. *Mohr v. State Bank of Stanley,* 241 Kan. 42, 45, 734 P.2d 1071 (1987); *Theis v. DuPont, Glore Forgan, Inc.,* 212 Kan. 301, 306, 510 P.2d 1212 (1973). The actual authority of an agent may be either express or implied. *Id.*

In general terms, the Kansas Supreme Court has given the following guidance in distinguishing between the different types of agency:

It is an express agency if the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act. It is an implied agency if it appears from the statements and conduct of the parties and other relevant circumstances that the intention was to clothe the agent with such an appearance of authority that when the agency was exercised it would normally and naturally lead others to rely on the person's acts as being authorized by the principal. An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent.

*Shawnee State Bank v. North Olathe Industrial Park, Inc.,* 228 Kan. 231, 236–37, 613 P.2d 1342 (1980); *see also Professional Lens Plan, Inc. v. Polaris Leasing Co.,* 238 Kan. 384, 390–91, 710 P.2d 1297 (1985).

Before addressing the applicability of the different theories of agency, the court will first note some features of the current case which distinguish it from the cases cited by AgriStor as being on point and controlling on this issue.

In most of the cases relied on by AgriStor, the court found that an agency relationship had not been sufficiently shown because there were no facts properly before the court which could be construed as establishing that the alleged principal had any ability to "control" the alleged agent's conduct. *See Meuli,* 634 F.Supp. at 1215; *Kjergaard,* No. 4–83–756, slip op. at 5, 1985 WL 403; and *CIT Financial,* 5 Kan.App.2d at 229, 615 P.2d 774. None of those cases, however, discuss or mention the applicability of agency by implied actual authority, by apparent authority, or by ratification. Thus, the court must assume that those theories were not properly before the court.

In contrast, the Bertholfs have alleged and offered factual support (as more specifically addressed hereafter) for an agency by such theories. Moreover, this distinction is important to note, because with both implied actual authority and apparent authority, it is the principal's action of furthering or allowing an appearance of au-

thority—not the actual ability to control the agent—which is key. Furthermore, two factually similar cases recently addressing the applicability of the theories of implied actual authority and apparent authority have held that it was reversible error to find at the summary judgment stage that the lease precluded such theories. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 738–39 (8th Cir.1987) (specifically noted that the district court erred in focusing exclusively on the issue of control); and *Krank v. A.O. Smith Harvestore Products, Inc.,* 456 N.W.2d 125, 130–31 (N.D.1990).

Another distinguishing factor is that in the cases cited by AgriStor, it was undisputed that the lessee had agreed to the terms of the written lease. For example, in *AgriStor Leasing v. Schmidlin,* 601 F.Supp. 1307, 1313 (D.Or.1985), the only oral representations allegedly contrary to the terms of the lease concerned the future performance of the system. Moreover, the court found that a merger clause in the lease, which stated that the lessee did not rely on any promises or conditions except those in the written lease, was conspicuous (in bold letters), and that each lessee had signed his initials directly below such provision. *Id.* Furthermore, the applicable law required that the merger clause could "be disregarded only if its enforcement here 'would be unconscionable or ... its specific inclusion was due to duress, overreaching, undue influence or fraud.'" *Id.* (quoting *Galego v. Knudsen,* 282 Or. 155, 164, 578 P.2d 769 (1978)). Since no such evidence was properly before the court, the court concluded that summary judgment was appropriate.

■ In contrast, oral representations about the future performance of the Harvestore system are not the primary issue in this case. The primary issues are whether the Bertholfs were fraudulently misled by Gwaltney to believe that reading the lease was not necessary, and whether the Bertholfs reasonably believed part of the agreement in question was as Gwaltney orally represented it to be.

Furthermore, there are facts properly before this court which could support a finding that the merger clause itself was entered into under "duress, overreaching, undue influence or fraud." For example, Don Cress' affidavit indicates that Gwaltney specifically agreed that part of the relevant agreement was not to be included in the written lease agreement. Moreover, it is an established fact that the Bertholfs did not read the lease. Furthermore, Gwaltney specifically acknowledged he was the one who explained the lease to the lessees/farmers, and that most farmers did not read the lease before they signed it. However, Gwaltney admits that he did not read this particular lease and could not have told anyone what was in the fine print without a lawyer.

If all reasonable inferences from these facts are drawn in favor of the Bertholfs, as required at the summary judgment stage, fraudulent inducement of the lease could be established. *See U.S. v. 1,557.28 Acres of Land in Osage Co., Kansas,* 486 F.2d 445 (10th Cir.1973) (parol evidence contradicting the terms of a contract is always admissible to show the contract was procured by fraudulent inducement). Thus, such facts distinguish this case from those cases finding that it's unreasonable to rely on a salesman's representations which are contrary to explicit terms of a written agreement.

The court will now more specifically address the applicability of the different theories of agency.

■ The Bertholfs first allege that an express agency can be established by the fact that the Dealer Agreement on Leasing between AgriStor and Mid–Am (as the dealer) provides:

(1) That the "[d]ealer from time to time will cause lease agreements in the form presented by Agristor to Dealer (hereinafter the Lease Agreement(s)) to be completed and executed by prospective Lessees and will forward such Lease Agreements to Agristor for execution."

(2) That the dealer warrants and agrees that the lease is genuine, properly authorized and executed, and properly

completed; that all equipment described in the lease is accurately described; that the dealer does not know of any matters not already described to AgriStor which may impair the credit of the lessee.

(3) That "[u]pon the termination of any Lease Agreement, and in the event of a Lessee's default or breach of any Lease Agreement, Dealer agrees to perform the following:

(a) Dealer will use its best efforts to sell any item of Equipment as the *agent* for AgriStor...."

(G. Kobilan Aff., Ex. A, at init. para.; §§ (B)(1), (4), (6) & (8); & § C(1)(a) (emphasis in quoted material added)).

The Bertholfs also acknowledge, however, that the dealer warrants and agrees in the Dealer Agreement on Leasing that it "has not made and will not make any agreements, warranties or representations on behalf of Agristor, ..." (G. Kobilan Aff., Ex. A, § B(2).)

In giving instruction on how an express agency can be established, the Kansas Supreme Court has said that the record "must be examined to ascertain if the party sought to be charged as principal has delegated authority to the alleged agent by words which expressly authorize the agent to do the delegated act." *Brown v. Wichita State University*, 217 Kan. 279, 286, 540 P.2d 66 (1975), *vacated in part*, 219 Kan. 2, 547 P.2d 1015 (1976).

■ Although the provisions cited by the Bertholfs do tend to show that AgriStor sent some signals in its Dealer Agreement on Leasing that the dealer was to some extent its agent, the court must conclude that other express language in the agreement precludes a finding of express actual authority in this case. In other words, since the dealer agreement on leasing states that the dealer will not make any agreements on behalf of AgriStor, the court must find that Gwaltney did not have express authority to bind AgriStor to terms contrary to those expressed in the lease agreement. *See Meuli*, 634 F.Supp. at 1211. However, such a finding does not preclude a finding that Gwaltney possessed

implied or apparent authority to change those terms. *Farrow*, 826 F.2d at 737 n. 7.

Determination of whether actual agency exists (either express or implied) focuses on communications and contacts between the principal and the agent. *Farrow*, 826 F.2d at 737; RESTATEMENT (SECOND) OF AGENCY § 26 (1958). In addition, the Kansas Supreme Court has given the following instruction for the finding of implied authority:

"The relation of agency need not depend upon express appointment and acceptance thereof, but may be, and frequently is, implied from the words and conduct of the parties and the circumstances of the particular case. If, from the facts and circumstances of the particular case, it appears that there was at least an implied intention to create it, the relation may be held to exist, notwithstanding a denial by the alleged principal, and whether or not the parties understood it to be an agency....

"An implied agency must be based on facts for which the principal is responsible, they must, in the absence of estoppel, be such as to imply an intention to create the agency, and the implication must arise from a natural and reasonable, and not from a forced, strained, or distorted, construction of them. They must lead to the reasonable conclusion that mutual assent exists, and be such as naturally lead another to believe in and to rely on the agency."

*Carver v. Farmers & Bankers Broadcasting Crop.*, 162 Kan. 663, 670–71, 179 P.2d 195 (1947) (quoting 2 C.J.S. 1045 § 23). *See Brown*, 217 Kan. at 286–87, 540 P.2d 66; and *Mohr*, 241 Kan. at 46, 734 P.2d 1071.

As already discussed in the court's discussion on express authority, the dealer agreement on leasing did give some signals to dealers that it had some authority to act on behalf of AgriStor. In other words, by authorizing and requiring the dealer (1) to accurately complete, execute, and return its lease form, (2) to relay any information about the lessee which may affect his credit, and (3) to be AgriStor's agent in the

event of default or termination of the lease, AgriStor clothed the dealer with the appearance that the dealer was its agent to some extent.

Other circumstances which indicate that AgriStor in fact intended Mid–Am and its salesman to act on its behalf include the fact that after attending a seminar sponsored by AgriStor on how to present the leases to farmers, Gwaltney believed AgriStor authorized him to tell farmers about the lease option. In addition, the leasing sales manual given to Mid–Am instructs that leasing can be an effective closing tool and that the "professional Harvestore salesman" must understand the benefits of leasing and be prepared to answer customer's questions. (Gwaltney Depo., Ex. 16.) Furthermore, that manual goes on to instruct salesmen to tell farmers that "AgriStor wants you to know everything possible about its program. They don't believe in surprises or hidden charges;" that "[s]hopping around for money takes time and anymore you usually have to have an appointment or wait. *I can handle everything right here on the farm;*" and that "[t]he most time consuming part of getting a loan is all the blasted paper work—and it seems everyone wants it their way. *I know what AgriStor needs and I'll help you with it.*" (*Id.;* emphasis added.)

Moreover, it is an uncontroverted fact that AgriStor authorized the dealer, and the dealer authorized Gwaltney, to accept security deposits. Furthermore, it is undisputed that in a letter dated April 2, 1980 (sent by AgriStor Credit to Mid–Am to acknowledge approval of the lease with Don Cress and instruct Mid–Am on necessary documents to finalize the agreement), and in the lease agreement itself, AgriStor states that the *lessee* must send the *lessor* a check for the full amount of the security deposit. However, AgriStor allowed Gwaltney to accept a check from Don Cress for less than the full amount of the security deposit and the check was not made to Agristor: it was to Mid–Am.

Finally, it is important to note that AgriStor's only business is providing the capital needed to finance Harvestore products, and that such service is offered exclusively through Harvestore dealers only to Harvestore customers. In addition, Gwaltney has testified that he felt that it was part of his job, as a salesman for a Harvestore dealer, to solicit business for AgriStor.

Given all the above facts, it cannot be seriously doubted that AgriStor sent some signals to Mid–Am and Gwaltney which would lead a reasonable person to believe that Mid–Am and Gwaltney had authority to act as AgriStor's agent to some degree. However, the extent to which such authority extends is not necessarily clear. This ambiguity merely supports a finding that summary judgment is not appropriate on this issue though. *See Board of Trade of City of Chicago v. Hammond Elevator Co.,* 198 U.S. 424, 438–40, 25 S.Ct. 740, 743–44, 49 L.Ed. 1111 (1905) (held that even though documents state that the alleged agent has no authority to bind the principal, the court will look to the surrounding facts as to the character of the alleged agent to see if the law will imply the power and impute the authority to him).

Next, the applicability to this case of the theory of agency by apparent authority will be addressed.

In contrast to agency by express or implied authority, which focuses on communication and contacts between the principal and agent, the creation of apparent authority focuses on conduct or communications between the principal and a third party. *Farrow,* 826 F.2d at 737; RESTATEMENT (SECOND) OF AGENCY § 27 (1958); and 3 AM.JUR.2d, Agency § 79 (1986). Furthermore, the Kansas Court of Appeals has instructed that:

A review of the authorities reveals that the apparent authority of an agent to bind the principal rests upon words or conduct of the principal which leads the third party dealing with the agent to reasonably believe the agent's authority is sufficient to cover the transaction in question. In some cases, of course, the words or conduct of the principal are overt and explicit. In other cases, the mere relationship between the agent and principal or the title conferred upon the

agent by the principal is sufficient to constitute a representation of some authority.

*Bucher & Willis Consulting Engineers v. Smith,* 7 Kan.App.2d 467, 470, 643 P.2d 1156 (1982).

In the present case, there are several facts which, if viewed in the light most favorable to the Bertholfs, support a finding that Mid–Am and Gwaltney had apparent authority to bind AgriStor to terms different than stated in the lease. For instance, AgriStor provided Gwaltney with lease forms and a chart so that he could tell farmers their lease rate according to the number of years of the lease. In addition, the Harvestore Systems 1982 Products Buyers Guide states that the Harvestore dealer is an important source of assistance in financing and can offer financing and leases from AgriStor Credit.

Furthermore, although installation of the Harvestore system was not explicitly provided for in the lease, AgriStor followed Gwaltney's representations to Don Cress that such was part of the lease agreement. In addition, even though the lease and other correspondence expressly provides that the lessee is to make a check to the lessor for the full amount of the security deposit, AgriStor, in accordance with an agreement between Gwaltney and Don Cress, allowed Gwaltney to accept an amount less than the full security deposit from Don Cress and also allowed Don Cress to make the check payable to Mid–Am. Thus, since AgriStor apparently allowed Gwaltney to add to or change some terms of the lease agreement (apparently ignoring express contrary language), it may be reasonable to infer that he had the authority to change other terms in the lease agreement.

As a result, the court must conclude that there is a question of fact as to whether Gwaltney had sufficient apparent authority to change the terms of the lease. *See Farrow,* 826 F.2d at 739 and *Krank,* 456 N.W.2d at 130–31.

The court also concludes that summary judgment is not appropriate on the question of agency by ratification. The Kansas Supreme Court has often said that:

Ratification is the adoption or confirmation by a principal of an act performed on his behalf by an agent which act was performed without authority.... Upon acquiring knowledge of his agent's unauthorized act, the principal should promptly repudiate the act; otherwise it will be presumed he has ratified and affirmed the act. Knowledge of the unauthorized act is essential for the principal to ratify the act, and must be shown or facts proved that its existence is a necessary inference therefrom.

*Brown,* 217 Kan. at 287–88, 540 P.2d 66 (citation omitted). *See also Adrian v. Elmer,* 178 Kan. 242 syl. 4, 284 P.2d 599 (1955) (when a principal elects to ratify an unauthorized act, he ratifies the whole of it).

As the court has already mentioned, AgriStor knew that Gwaltney changed the amount due and the payee of the security deposit and AgriStor never objected to or repudiated such act. Furthermore, when the addendum was signed by Ruth Alice Bertholf, she again stated (to someone who was clearly an agent of AgriStor) that she did not want to be obligated to buy a blue silo.

Resolving all reasonable inferences in favor of the Bertholfs, these facts indicate AgriStor knew that the Bertholfs' understanding of the lease agreement was not as stated in the lease. Furthermore, there is at least a question of fact as to whether AgriStor ratified part of Gwaltney's allegedly unauthorized acts. As a result, summary judgment is not appropriate on this issue either.

Next, some attention must be given to the issue of whether the parol evidence rule precludes the consideration of any evidence contrary to the written terms of the lease.

The general rule in Kansas is that the terms of a written contract cannot be collaterally attacked by parol evidence even if such contract was not read by one of the parties. *See Washington v. Claassen,* 218 Kan. 577 syl. 2, 545 P.2d 387 (1976). However, parol evidence has been held admissi-

ble to show the nonexistence of a binding contract because of mutual mistake, fraudulent representations, or to explain incomplete and ambiguous writings. *Sidwell Oil & Gas Co. v. Loyd,* 230 Kan. 77, 630 P.2d 1107 (1981); *Stapleton v. Mendoza,* 174 Kan. 468, 471, 257 P.2d 113 (1953). In addition, it has been said that parol evidence is always admissible to show a failure of consideration or that a note was given merely as an accommodation to the payee. *Rice v. Rice,* 101 Kan. 20 syl. 2, 165 P. 799 (1917). Furthermore, between the original parties, oral evidence has been held admissible when offered to prove the parties did not assent to the written contract as a complete and accurate integration of their agreement. *Branstetter v. Cox,* 209 Kan. 332, 335, 496 P.2d 1345 (1972).

The affidavit of Don Cress expressly alleges that Gwaltney and Don Cress specifically agreed that part of the lease agreement was not included within the written lease. (D. Cress Aff., ¶ 10.) In addition, a finding in this case that the lease agreement was not the complete integration of the agreement is supported by the fact that some of the oral representations made by Gwaltney were actually performed (*e.g.,* check to Mid–Am for less than the lease stipulated and installation of the system). Thus, parol evidence will be allowed to the extent necessary to establish whether the lease agreement was fully integrated.

In addition, parol evidence will be allowed to establish the lease was fraudulently entered into. As the court has already indicated, the Bertholfs have provided sufficient factual support to raise a genuine issue of material fact of fraudulent inducement. For instance, the facts indicate that Lee Bertholf did not read the lease, was not given any meaningful opportunity to read the lease, and relied on Gwaltney to explain what the terms of the lease were. However, even though Gwaltney knew that the Bertholfs did not read the lease and were relying on him to tell them what the terms of the lease were, Gwaltney candidly admits that he could not fully explain what was in the fine print of the lease.

Furthermore, Gwaltney asked Lee Bertholf to sign the lease. When Lee Bertholf objected, saying that he did not want to buy a silo, Gwaltney responded that if it did not work for the kids they would just come and get it. Since they were talking about the contract at the time, Lee Bertholf thought that those representations were written in the contract. Moreover, Lee Bertholf specifically alleges that he relied on the representations in signing the lease and in instructing his wife to sign the lease.

Although such representations may not be explicitly contrary to the written terms of the lease, a reasonable inference from them is that if the Cresses defaulted, AgriStor would be able to come and get the silo and the Bertholfs would not owe AgriStor anything. This, in conjunction with the fact that Gwaltney knew that the Bertholfs did not read the lease agreement, may rise to the level of a concealment. These facts, as well as representations made to Ruth Alice Bertholf to induce her to sign the addendum, raise a genuine issue of material fact of fraud.

Furthermore, if Gwaltney and AgriStor's agent were merely mistaken about such representations (i.e., did not know the effect of the lease), then there was a mutual mistake. Thus, parol evidence would be allowed to the extent necessary to establish such mistake.

In addition, it has been recognized that even a unilateral mistake will allow reformation of the contract where the other party knew of the mistake and hardship amounting to injustice would be inflicted by holding the mistaken party to the agreement. In other words, it would be harsh and unreasonable to enforce the agreement. *Squires v. Woodbury,* 5 Kan. App.2d 596, 599, 621 P.2d 443 (1980). Since the facts indicate that agents of AgriStor knew or should have known that the Bertholfs' understanding of the contract was different than the explicit written lease agreement, summary judgment cannot be granted on this issue.

Parol evidence will also be allowed to establish that the Bertholfs signed the

lease as accommodation parties. The Bertholfs have properly supported their allegations that they received no direct benefit from this lease arrangement and that they are merely accommodation parties. Furthermore, the Bertholfs have provided factual support for a finding that AgriStor and Don Cress, without the Bertholfs' prior consent, entered into an agreement for the final purchase of some of the equipment subject to the lease agreement on which the Bertholfs were accommodation parties. Since the general rule is that a gratuitous or accommodation guarantor is discharged by any unauthorized change in his obligation, *Kutilek v. Union National Bank of Wichita*, 213 Kan. 407 syl. 6, 516 P.2d 979 (1973), summary judgment is not proper on this issue.

Furthermore, the Bertholfs have presented sufficient factual support to preclude summary judgment on the issue of unconscionability. *See John Deere Leasing Co. v. Blubaugh*, 636 F.Supp. 1569 (D.Kan. 1986). For instance, as has already been stated, the facts indicate that Lee Bertholf did not read the lease, was not given any opportunity to read the lease, and relied on Gwaltney to explain the terms of the lease. Furthermore, Gwaltney admitted that since he was not a lawyer, he could not explain what was in the fine print of the lease agreement. Moreover, due to the inequality in bargaining power and AgriStor's insistence on the unchangeability of the lease, it is clear this is an "adhesion" contract.

■ The Bertholfs' final argument is that the transaction was actually a sale with a lease intended as security, rather than a true lease. Although there appears to be some factual support for a finding that this was not a true lease,[3] a contrary finding has already been announced in a related case. *See In re Cress*, 106 Bankr.

246 (Bankr.D.Kan.), *aff'd*, (D.Kan.1989) 1989 WL 159390. Thus, the court is compelled to find as a matter of law that this was a true lease.

### *Conclusion*

As the court has set forth more fully above, material factual issues remain in this case as to the following: whether Gwaltney was AgriStor's agent either by implied actual authority, apparent authority, or ratification; whether the lease agreement was entered into under fraudulent inducement, mutual mistake, or sufficient unilateral mistake; whether the lease agreement was unconscionable; and whether the Bertholfs were accommodation parties and the effect of such status on this case. However, AgriStor is entitled to summary judgment as a matter of law on the issues of express actual authority and whether the lease agreement was a true lease.

IT IS THEREFORE ORDERED this 11 day of December, 1990, that AgriStor's motion to strike the affidavit of Don Cress (Dkt. No. 27) is denied.

IT IS FURTHER ORDERED that AgriStor's motion for summary judgment (Dkt. No. 15) is granted on the issues of whether Gwaltney had express agency authority and whether the lease agreement was a true lease. On all other issues, AgriStor's motion for summary judgment is denied.

---

3. For example: Gwaltney always explained the AgriStor lease as a way to finance the purchase of a Harvestore silo; Gwaltney represented to Don Cress that the equipment could be purchased at the end of the lease term for about 10% of the original purchase price or not more than one additional lease payment; the changes made in the purchase orders (dated March 8,

1980) after Don Cress had signed them; and a letter from AgriStor to Mid–Am dated March 20, 1980, which states "that Don Cress's application for *credit* in the amount of $91,017 does not meet AgriStor Leasing's guidelines for *financing*." (L. Bertholf Depo., Ex. 4 (emphasis added).)