**Stephen A. ROVTAR, Plaintiff,**

v.

**UNION BANK OF SWITZERLAND, Defendant.**

No. 92 Civ. 3706 (CBM).

United States District Court, S.D. New York.

Jan. 14, 1994.

Goldfarb & Arrandt, William Teleisha, New York City, for plaintiff.

Jackson, Lewis, Schnitzler & Krupman, Mark S. Mancher, New York City, for defendant.

## MEMORANDUM OPINION

MOTLEY, District Judge.

Plaintiff Steven A. Rovtar ("Rovtar"), a former employee of defendant Union Bank of Switzerland ("UBS"), brings this action for damages, declaratory and injunctive relief arising from his discharge. Plaintiff alleges violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Additionally, plaintiff seeks damages for breach of an alleged employment contract.

After plaintiff properly exhausted his administrative remedies, he filed a complaint with this court.[1] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant has moved for summary judgment. For the reasons set forth below, this court grants defendant's motion for summary judgment on all claims.

1. As stated in his complaint, plaintiff timely filed a charge against defendant with the United States Equal Employment Opportunity Commission ("EEOC") concerning his allegedly unlawful discharge. Comp. ¶ 4. Following an investigation, the EEOC issued a determination finding no evidence of discrimination. Defendant's Memorandum of Law In Support of its Motion for Summary Judgment at 14 ("Def.'s Mem.Supp. Summ.J.").

2. While plaintiff alleges that he was terminated in April 1991, defendant has submitted an affidavit stating that he was terminated in January 1991. Defendant's Certification of Exhibits ("Def.'s Exhibits"), Affidavit of Catherine Thomp-

## BACKGROUND

Mr. Rovtar, a fifty year-old white male at the time he filed his complaint in this matter, was employed by UBS from April 1984 until April 1991. Comp. ¶ 8.[2] From 1984 until 1986, plaintiff was assigned to the bank's Internal Services Section, where he was responsible for building maintenance and small construction projects. In 1986, plaintiff was transferred to the Premises Section where he remained until his termination in 1991. Def.'s Exhibits, Ex. 2C.[3]

UBS is a global financial institution with its corporate headquarters in Zurich, Switzerland and several foreign branches. The New York branch, established in 1974, employs approximately 1,300 individuals, the overwhelming majority of which are United States citizens. Def.'s Exhibits, Thompson Aff. ¶ 7.

In addition to its United States employees, defendant also temporarily assigns expatriates or trainees from its corporate headquarters to perform services at various branches, including the New York branch. Def.'s Memo.Supp.Summ.J. at 6. Expatriates are primarily senior employees who are assigned to foreign branches for specific periods ranging from three to five years. Trainees are junior employees assigned abroad to broaden their personal experience and professional skills. These assignments generally last between twelve and eighteen months. Even though they are assigned to a foreign branch, such personnel remain employees of the Zurich bank due to the temporary nature of their assignments. Def.'s Exhibits, Thompson Aff. ¶¶ 3, 4.

son ¶ 17 ("Thompson Aff."). Since this dispute is not material to the resolution of this case, the Court will accept plaintiff's allegation for purposes of this opinion.

3. While plaintiff contends that he remained responsible for building maintenance and defendant merely "shifted [some of his job duties] to providing support for housing for ... Swiss trainees and expatriates which were sent to the New York branch," defendant has submitted an internal memorandum which clearly shows that plaintiff was transferred to a new department and given a new position within the bank. Def.'s Exhibits, Ex. 2C.

In the New York branch, the Premises Section is directly responsible for handling the housing needs of expatriates and trainees. As a supervisor of the Premises Section, Rovtar was primarily responsible for "coordinating [the] physical relocation of trainees and expatriates." This included, in order of importance: 1) arranging housing for trainees; 2) organizing and procuring furniture for their apartments; 3) performing various administrative functions; 4) inspecting apartments; and 5) supporting expatriates in their housing needs. Plaintiff directly reported to Mr. Max Keller, Head of the Premises Section and directly supervised Ms. Arcadia Cruz, an Administrative Assistant. Def.'s Exhibits, Ex. 2C.

It is undisputed that due to various complaints made by the trainees about their lodging, Mr. Beat Bucher, Vice President of Personnel, conducted a study to examine the bank's current housing policies. On June 11, 1990, Bucher issued a report entitled "Housing Procedures UBS New York" wherein he proposed three alternatives to the bank's current policies. In short, Bucher proposed that UBS: 1) purchase rental property which could be leased directly to expatriates and trainees; 2) provide a housing allowance and allow the employees to search for their own housing; or 3) hire an outside real estate agency to manage all housing matters. Def.'s Exhibits, Ex. 2E at 4, 5.

After addressing the concerns of the trainees as well as the administrative burdens previously experienced by the bank, Bucher ultimately recommended that UBS "handover our Intern [trainee] housing matters to an outside real estate company.[4]" Def.'s Exhibits, Ex. 2E at 6. UBS accepted Bucher's recommendation and Acocella & Company ("Acocella") was hired on December 18, 1990. Def.'s Exhibits, Ex. 2F; Thompson Aff. ¶ 14. Under the UBS contract, Acocella would be responsible for, *inter alia:* 1) negotiating all leases and renewals for trainees, subject to approval by UBS; 2) assisting UBS expatriates in finding adequate housing when needed; 3) signing all leases approved by UBS as

its agent; 4) acting as liaison between UBS and the respective landlords; 5) furnishing the apartments for UBS employees; and 6) handling problems and complaints as they might arise. Def.'s Exhibits, Ex. 2F ¶¶ A.4.1–5, B.

The Bucher report did not address plaintiff or his performance. Further, neither plaintiff's age or national origin appear to have been considered in any of the proposals or the ultimate recommendation. However, by deciding to transfer all housing matters to an independent real estate agency, defendant clearly eliminated plaintiff's position with UBS. Thus, plaintiff was terminated in April 1991, the act which gave rise to plaintiff's complaint and the present motion for summary judgment.

### DISCUSSION

#### I. Summary Judgment

A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986).

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265, 273–75 (1986). Once the movant has established a *prima facie* case demonstrating the absence of a genuine issue of material fact, the nonmoving party must provide enough evidence to support a jury verdict in its favor. *Anderson,* 477 U.S. at 249, 106

---

**4.** According to Bucher, this alternative was the most advantageous one for UBS because it would allow better cost control and permit UBS to direct housing policies without becoming involved in the daily real estate matters which were unrelated to its business. Def.'s Exhibits, Ex. 2E at 6.

S.Ct. at 2510–11, 91 L.Ed.2d at 212; *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). At that point, the court must determine whether the evidence presents a "genuine factual issue that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511, 91 L.Ed.2d at 213. Based upon the evidence submitted by the parties on defendant's motion, there are clearly no genuine issues of material fact. Accordingly, defendant is entitled to summary judgment as a matter of law.

## II. Applicable Statutes and Burden of Proof

■ The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1) (1993). Moreover, Title VII provides that "it shall be an unlawful employment practice for an employer—(1) [t]o discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1993). While an employer is prohibited from terminating an employee because of that person's age or national origin, neither statute precludes a termination for legitimate business purposes. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239, 109 S.Ct. 1775, 1784–85, 104 L.Ed.2d 268, 280 (1989).

As plaintiff admits, the order and allocation of proof in discrimination cases are well-established. In *McDonnell–Douglas Corp v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court developed a three-part analysis for allocating the burden of proof in such cases. To prove a claim of discrimination, plaintiff must first establish a *prima facie* case of discrimination, which can be accomplished by proving: 1) that he was a member of a protected class (i.e., at least over forty years of age); 2) that he was qualified for his position; 3) that he was discharged notwithstanding his qualifications under circumstances giving rise to an inference of discrimination. *Id.* at 802, 93

S.Ct. at 1824, 36 L.Ed.2d at 677; *Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40, 43 (2d Cir.1988).

Second, if plaintiff establishes his *prima facie* case, the burden then shifts to defendant to show "some legitimate, nondiscriminatory reason for the employment decision." *Id.* at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678. Defendant is not required to prove its reason to meet its burden, but merely articulate a legitimate explanation for its actions. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256–60, 101 S.Ct. 1089, 1095–97, 67 L.Ed.2d 207, 217–219 (1981).

Third, if defendant articulates a legitimate nondiscriminatory explanation, plaintiff must "be afforded a fair opportunity to show that [the] stated reason for [his termination] was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825, 36 L.Ed.2d at 679. However, as the Supreme Court further articulated in *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407, 418–19 (1993), merely "reject[ing] the defendant's proffered reason[ ]" without more is not sufficient to prove that it is a pretext for discrimination under the *McDonnell Douglas* standard. To the contrary, "[a] reason cannot be proved to be 'a pretext for discrimination' unless it is shown 'both' that the reason was false, 'and' that discrimination was the real reason." *Hicks*, —— U.S. at ——, 113 S.Ct. at 2752, 125 L.Ed.2d at 422 (emphasis in original).

## III Application

### A. *Plaintiff has failed to establish a prima facie case of discrimination*

As outlined above, plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Thus, he must prove that he was a member of a protected class under ADEA, that he was reasonably qualified for his position at UBS, and that he was discharged and replaced by a younger employee of Swiss origin. As Rovtar was over forty years old when he was discharged, it is undisputed that he is a member of a protected class under ADEA and Title VII. Moreover, it is clear from plaintiff's performance evaluations that he was qualified for his position in

the Premises Section. However, plaintiff has failed to establish that he was terminated and replaced by a younger Swiss employee.

Plaintiff claims that defendant terminated his employment because of his age and because he was a United States citizen. More specifically, plaintiff alleges that "the individuals terminated [including himself] were forty years of age or older and of non-Swiss national origin and the employees replacing them were substantially younger and less experienced and of Swiss national origin." Comp. ¶. Plaintiff further alleges that various comments made by bank officials in internal memorandums and performance evaluations also "contain[ed] obvious preferences for Swiss and younger employees." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 9–11 ("Pl.'s Memo.Opp'n Summ.J.").

While plaintiff has made numerous allegations of age discrimination, he has failed to offer any credible evidence to support these claims. For instance, plaintiff claims that he was told that he was being replaced by two younger Swiss employees. Yet, he testified at his deposition that he learned of his replacement directly from the employees themselves and from other individuals outside the organization.[5]

5. For example, plaintiff stated that his job duties were primarily taken over by two younger Swiss employees, Christian Breutel and Octavia Sallis–Gross Hanna. However, as illustrated by the following excepts from plaintiff's deposition, this information was not communicated to him from senior bank officials or anyone who had authority to speak on behalf of UBS.

Q. Let's talk about maintenance. What responsibilities for maintenance did you have that were taken away from you?

A. Whatever ongoing maintenance that was required. For example, they needed piping or additional fire extinguishers, a hook-up to the kitchen by an outside contractor or if we had plumbing or electrical problems. All the small—

. . . . .

Q. Who was assigned maintenance for the 299 Park Avenue Building?

A. Most of these duties were taken over by Christian Breutel. He was a Swiss trainee.

. . . . .

Q. How do you know that Mr. Breutel took over that position?

A. He told me.

Q. What was the statement that you allege Mr. Breutel made to you?

A. He was asking me instruction about what to do on these various different jobs that I was assigned. He had a job description of what to do in German, but he didn't understand what some of the things meant even though it was in German, maybe it lost something in the translation, and came over and asked me specific questions and said he was going to handle maintenance. He is going to handle the artist loft and a few of the other jobs.

. . . . .

Q. Who would you deal with in personnel?

A. I dealt with Swiss trainees. They would change every six months. One of them was Octavia Sallis–Gross. I don't remember a lot of the others. I remember her because she came back in another capacity.

Q. When you say she came back in another capacity, what was the capacity she came back?

A. She took over part of my job when I left.

. . . . .

Q. Specifically what are you alleging she took over from you, what job function?

A. She went out and interreacted (sic) with landlords and started looking for apartments.

Q. How do you know she did that?

A. From the landlords.

Q. Which landlords told you that?

A. One of them is Otto Teitler and that was one of the landlords. One of the real estate brokers told me she was looking at other real estate was Judy Couteler, I forget the name of the brokerage house she worked for.

. . . . .

Q. Other than this information conveyed by this individual, do you have any other basis for believing that Miss Sallis–Gross Hanna took over your job?

A. Other than the brokers and the landlords, I don't.

. . . . .

Q. With regard to Mr. Breutel, do you have reason to believe that he took over some of your job functions?

A. Yes.

Q. You mentioned maintenance before. Specifically with regard to housing, do you know whether he took over any of your job functions?

A. Yes, he did.

Q. What functions did he take over?

A. He told me and he needed coaching. He told me why he was taking over. He took over the position of trying to obtain the loft rent deposits, he became liaison between the brokers and UBS accepting the leases and all of the other functions that I did.

Q. When you say he needed coaching, what do you mean?

A. He didn't know how to handle the job function.

■ It is well-established in the Second Circuit that an oral or written · statement made by an employee is admissible against his or her employer under the admissions exception to the hearsay rule only if it was spoken or written within the scope of his or her authority. *See* Fed.R.Evid. 801(d)(2); *Northern Oil Co. v. Socony Mobil Oil Co.*, 347 F.2d 81, 84 (2d Cir.1965) ("[w]ithout some foundation that the utterance was within the apparent range of the employee's authority, the statement [is inadmissible]"). Clearly, a lower-level employee who is assigned abroad for a maximum period of eighteen months lacks authority to speak on behalf of UBS. As a result, any statements which the employees allegedly made are inadmissible for purposes of deciding this motion. Additionally, this court finds the statements allegedly reported to plaintiff by the outside real estate brokers, several of whom he could not even identify, are inadmissible hearsay. Fed.R.Evid. 801. Thus, these allegations cannot be used to support an inference of discrimination.

■ Plaintiff further claims that this court may infer discrimination from comments made on his performance evaluations by his Supervisor, Mr. Max Keller, an employee of Swiss origin. Plaintiff contends that Keller's evaluations contained such comments as "seems to be unconcentrated lately," which allegedly "show a clear bias in terms of age and national origin [and] led to the termination of defendant (sic) and the advancement of those youthful Swiss under the bank's programs." Pl.'s Memo.Opp'n Def.'s Summ.J. at 10–11.

Again, the allegations are unsupported and apparently have been arrived at by pure speculation and conjecture. For example, when examined about these comments at his deposition, plaintiff responded only that "it was possible" that Keller's comments about his concentration were discriminatory.[6] He also testified that he never complained to anyone in senior management about the statements. Since it is not uncommon for persons of all ages to have problems concentrating during certain periods in our increasingly stressful lives, plaintiff's allegation does not support his discrimination claim.

Finally, plaintiff has offered "statistical evidence" to support his claim which we find equally unpersuasive. According to plaintiff, "defendant admits that its Swiss workforce in New York averaged over 12% of the total workforce" and it "cannot deny that it involuntarily terminated no Swiss employees during the years 1988 through 1992 whereas it involuntarily terminated 122 individuals of United States origin." As a result, this evidence is "statistically significant to show discrimination." Pl.'s Memo.Opp'n Def.'s Summ.J. at 3. Plaintiff further argues that "other documentation reveals that the Swiss expatriate (sic) were assigned to 'key' posi-

Q. When did he approach you? You said he approached you and asked for assistance?
A. Yes. Just shortly before I was let go in early December.

. . . . .

Q. After Acocella came on, what did you understand Mr. Breutel's—
A. He still approached—
Q. —what did you understand Mr. Breutel's function to be with regard to housing?
A. What did I understand his function?
Q. After Acocella began working with UBS.
A. I believe his function was still the same as before I left.
Q. What makes you believe that?
A. Because he contacted the landlords and there was a second landlord, Otto Teitler, and a landlord in Queens. It was an Irish name and I can't think of his last name, but he contacted these two landlords.
Q. Other than the fact that you say these landlords told you he was contacting them, do you have any other basis for believing that Mr.

Breutel continued to do that job after Acocella began working with UBS?
A. I had no way to monitor it much beyond that point.

Affidavit of William C. Teleisha in Opposition to Defendant's Motion for Summary Judgment ("Teleisha Aff."), Ex. GG at 134–36, 158–163 (Deposition of Stephen A. Rovtar ("Rovtar Depo.")).

6. More specifically, when asked to identify the discriminatory comments in his evaluations, Rovtar responded "I think on the very last evaluation on the back page where he starts to say that I am, seems to be unconcentrated lately, motivation has decreased (sic). I think he is trying to possibly say that I am getting old or whatever it may be." When again asked to specifically identify discriminatory statements, Rovtar stated only that he was elaborating on the previous statement and agreed that he was speculating that it was motivated by discrimination. Rovtar Depo. contained in the Teleisha Aff., Ex. GG at 127–28.

tions within the bank's branches abroad, obviously to maintain Swiss control and to continue its practices of favoring the Swiss over Americans." Pl.'s Memo.Opp'n Def.'s Summ.J. at 10.

Conversely, defendant contends that it maintains a policy of "staff[ing] local branches primarily with local employees." Def.'s Exhibits, Thompson Aff. ¶ 2. Accordingly, during the years plaintiff was employed by the bank, the number of Swiss employees ranged from nine to twelve percent of the bank's total New York workforce. Currently, the number of Swiss employees averages six percent of its New York workforce. Def.'s Exhibits, Thompson Aff. ¶ 6, 7.

Recognizing the difficulties inherent in proving discrimination cases under ADEA and Title VII, courts have allowed plaintiffs to use statistical evidence to establish their *prima facie* case. For instance, the Supreme Court has held that statistical proof alone may be sufficient to establish a *prima facie* case in certain circumstances. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396, 417 (1977). However, while it is clearly appropriate for plaintiff to rely on statistical evidence, *Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 920 (2d Cir.1981), the mere existence of such evidence does not preclude summary judgment. As the Second Circuit has aptly stated: "[w]here ... the statistical evidence ... leads to an indisputable result, the judge is justified in taking the evaluation of statistics from the jury." *Geller v. Markham,* 635 F.2d 1027, 1034 (2d Cir.1980).

Based upon the evidence submitted by plaintiff, there is no proof of age discrimination by any statistical showing of adverse impact. Plaintiff was forty-nine years old when he was discharged and the "statistical evidence" submitted does not show adverse impact against employees over forty years old. Moreover, this court is hard-pressed to find from the list of involuntary terminations submitted by plaintiff that defendant has terminated a disparate number of Americans. At any given point in time, over eighty percent of the bank's employees are American. As defendant has already stated, the overwhelming majority of Swiss employees are expatriates and trainees. Due to the temporary nature of their assignments, they remain employees of the parent bank in Zurich. It therefore follows that if any Swiss employees are involuntarily terminated, it would probably be reported on the records of the Zurich bank and not those of the New York branch. Thus, the evidence submitted by plaintiff actually harms his case and heavily weighs in favor of a judgment for defendant.

For these reasons, plaintiff has failed to establish a *prima facie* case of discrimination and defendant is entitled to summary judgment as a matter of law.

**B.** *Defendant has articulated a legitimate business reason for plaintiff's discharge.*

■ Since the court has granted defendant's motion because of plaintiff's failure to establish his *prima facie* case, it is unnecessary to discuss the two remaining burdens under the *McDonnell* test. However, it should be noted for the record that defendant has clearly articulated a legitimate business reason for its decision which is supported by documentary evidence.

As a financial institution, defendant contends that it became "increasingly dissatisfied with the degree of its involvement in serving the housing needs of expatriates and trainees." Def.'s Memo.Supp.Summ.J. at 11. Accordingly, a senior-level employee conducted an extensive study of the bank's current housing policies, outlined several alternative proposals for handling the housing needs of expatriates and trainees, and ultimately recommended that all housing matters be handled by an independent real estate agency. Def.'s Exhibits, Ex. 2E. Thus, Mr. Rovtar's position in the Premises Section was effectively eliminated when defendant accepted the recommendation of Mr. Beat Bucher to transfer all housing matters to Acocella and Company.

Based on the evidence submitted by defendant, this court is persuaded that it has "clearly set forth ... the reasons for plaintiff's rejection," and that such reasons are "legally sufficient to justify a judgment for ... defendant." *Burdine,* 450 U.S. at 255,

101 S.Ct. at 1094, 67 L.Ed.2d at 216. Plaintiff has simply failed to offer any direct or circumstantial evidence from which the court may infer that defendant's reason was a pretext and that its decision to terminate him was motivated by discrimination. Without more, his claims are merely "speculat[ive], conclusory allegations ... mere denials [which] are not enough to raise genuine issues of fact" and defeat defendant's motion for summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12.

This court has indulged plaintiff's repeated requests and allowed extensive discovery in this case.[7] Yet, in spite of the mountains of paper which plaintiff has produced, he has offered no reliable evidence to support his claim nor has he persuaded this court that defendant's stated reason is a pretext for discrimination. Accordingly, defendant's motion for summary judgment on plaintiff's claims under ADEA and Title VII is granted.

### III. Breach of Contract Claim

■ Plaintiff also claims that by discharging him, defendant breached his contract of employment with the bank. To support his contract claim, plaintiff relies on various oral statements allegedly made by senior-level employees concerning job security as well as similar written statements contained in an employee reference manual.

"It is well-settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Arledge v. Stratmar Systems, Inc.*, 948 F.2d 845, 847–48 (2d Cir.1991) (quoting *Sabetay v. Sterling Drug Inc.*, 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919, 920 (1987) (citations omitted)). Courts have also held that oral assurances and statements in employment manuals regarding employment stability do not alter an employer's ability to terminate an employee at will. *Cucchi v. New York City Off–Track Betting Corp.*, 818 F.Supp.

647, 653 (S.D.N.Y.1993) (citing *Paolucci v. Adult Retardates Ctr., Inc.*, 182 A.D.2d 681, 582 N.Y.S.2d 452, 453 (1992); *Diskin v. Consolidated Edison Co. of New York, Inc.*, 135 A.D.2d 775, 522 N.Y.S.2d 888, 890 (1987); *Kotick v. Desai*, 123 A.D.2d 744, 507 N.Y.S.2d 217, 219 (1986)).

The alleged oral employment contract, providing that if "plaintiff did the right job and just did what [defendant] needed ... [he] would have a job for as long as he lived," is without doubt, a contract for an indefinite period. Teleisha Aff., Ex. GG, Rovtar Depo. at 42. Likewise, defendant's alleged statements in the employment manual inferring that "longevity at the bank was based upon an employee's performance" does not specify a time period. In fact, plaintiff has failed to make one allegation or produce one shred of credible evidence from which this court could infer that plaintiff's employment contract was of a fixed duration. Thus, in accordance with established law on this issue, plaintiff's employment contract was terminable at will by either party and does not give rise to a cause of action. For this reason, defendant's motion for summary judgment on plaintiff's breach of contract claim is granted.

---

7. For instance, by order dated March 10, 1993, Magistrate Judge Leonard Bernikow granted plaintiff's requests to compel defendant to produce documents, answer interrogatories and produce various employees for deposition. This

Court has also granted plaintiff extensive discovery, including requiring defendant to produce several senior employees from the Zurich bank for deposition at considerable expense.