In re BARNEY'S, INC., et al., Debtors.

**BARNEY'S, INC. and Preen Realty, Inc., Plaintiffs,**

v.

**ISETAN COMPANY LIMITED, et al., Defendants.**

**ISETAN COMPANY LIMITED and Isetan of America Inc., Defendants-counterclaim Plaintiffs,**

v.

**BARNEY'S, INC., et al., Counterclaim Defendants.**

**Bankruptcy Nos. 96 B 40113 (JLG) to 96 B 40133 (JLG).
Adv. No. 96/8021A.**

United States Bankruptcy Court, S.D. New York.

March 14, 1997.

LeBeouf, Lamb, Greene & MacRae L.L.P., New York City, for Debtors.

Hughes Hubbard & Reed L.L.P., New York City, for Isetan Company Limited, et al. .

### DECISION ON PLAINTIFF DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Barney's, Inc. ("Barney's"), Preen Realty, Inc. ("Preen") and their debtor affiliates (together with Barney's and Preen, the "movants") seek partial summary judgment declaring that the agreements under which Barney's and its affiliates Madneer Corp. ("Madneer") and Barney's America Inc. ("Barney's America") occupy and manage Barney's stores in Chicago, Beverly Hills and New York City (the "Madison Avenue New York" store) are not "true leases" of nonresidential real property for purposes of § 365 of the Bankruptcy Code. The unsecured creditors' committee appointed herein supports the motion. Isetan Company Limited ("Isetan"), Isetan of America Inc. ("IOA") and the nominal landlords of the three stores, Calireen Realty Corp. ("Calireen"), Newireen Associates ("Newireen"), and Rush Oak Limited Partnership ("Rush Oak" and collectively, the "defendants"), oppose the motion. We deny it.

### Facts

Movants are chapter 11 debtors-in-possession herein. They commenced this adversary proceeding on January 11, 1996, the day after each filed its voluntary chapter 11 petition. In their complaint, they seek the following:

(1) enforcement of an alleged understanding and agreement between Barney's and Isetan that certain joint business projects undertaken by them would be restructured into a single global retailing company, or a Barney's/Isetan Global Partnership, in which Isetan

and the present owners of Barney's would share the equity ownership;

(2) a determination that three real properties housing the Chicago, Beverly Hills and Madison Avenue New York stores, which are held in the names of defendants Newireen, Rush Oak and Calireen, and which were constructed in part with financing provided by Isetan, were intended to be equity contributions by Isetan to Barney's and belong to Barney's;

(3) a judicial evaluation of the market value of the three properties so that Isetan may receive an appropriate equity interest in the reorganized debtors;

(4) a determination that the lease agreements for the Chicago, Beverly Hills and Madison Avenue New York stores are not true leases, but instead are impermissible and unenforceable mechanisms by which Isetan seeks to realize a preferred return at the expense of Barneys' creditors on its equity investment in the Barney's/Isetan Global Partnership;

(5) recovery for the benefit of Barneys' estate of approximately $50 million paid to Isetan and allegedly constituting preferred equity return to Isetan; and

(6) a determination that approximately $177 million purportedly loaned by Isetan and IOA to Preen, but which allegedly was used to complete construction of the Madison Avenue New York, Chicago and Beverly Hills stores, is part of defendants' equity contribution to the Barney's/Isetan Global Partnership, and not an enforceable loan.

Defendants deny that the Barney's/Isetan Global Partnership exists, or that the parties ever contemplated such a relationship. In their counterclaims, they allege that they are the lessors of the Chicago, Beverly Hills and Madison Avenue New York stores, and that Barney's, Madneer and Barney's America, respectively, are their tenants. Movants seek summary judgment pursuant to Fed. R.Bankr.P. 7056 and Fed.R.Civ.P. 56(c) that the purported lease agreements are not "true leases" for purposes of § 365 of the Bankruptcy Code.

### Discussion

We base our subject matter jurisdiction of this motion on 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A), (B), (F), (K) and (O).

Fed.R.Civ.P. 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). A fact is "material" only if it will affect the outcome of a lawsuit under applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable finder of fact could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Rovtar v. Union Bank of Switzerland,* 852 F.Supp. 180 (S.D.N.Y.1994). In assessing the merits of a summary judgment motion, we must view the record in the light most favorable to the non-moving party. *See, e.g., Nat'l Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203 (2d Cir.1989). We must determine " '[w]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Kulak v. City of New York,* 88 F.3d 63, 70 (2d Cir.1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 251–52, 106 S.Ct. at 2512); *see also Heyman v. Commerce Industry Insur. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975) ("on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried"). The movant must establish that no issue of material fact exists.

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

Movants contend that by examining documents executed by Barney's, Isetan and their affiliates since the inception of their relationship in 1989, including the February 10, 1989 letter agreement between the parties which refers to "a global retailing partnership" and the March 8, 1989 General Letter of Intent reciting the "desire" of the parties to "establish a long-term relationship ... to develop their respective retail businesses and related and other businesses", we can determine as a matter of law, without extrinsic evidence of the parties' intentions, that the legal status of defendants vis à vis Barney's, Madneer and Barney's America is not that of a lessor of real property for purposes of § 365 of the Bankruptcy Code. Barney's contends that when viewed in light of its overall relationship with Isetan, the documents prove that defendants are something other than real property lessors and that the leases are merely payment mechanisms for extracting a preferred guaranteed return on Isetan's investment.

Movants' Local Bankruptcy Rule 13(h) (now designated 7056–1) statement essentially catalogues the agreements they contend govern the relationship between Isetan, Barney's and their respective affiliates. In their Rule 13(h) counter-statement, defendants contest, or assert that after completing discovery they may contest, (i) that the February 10, 1989 letter executed by Isetan and Barney's created a "global retailing partnership", and (ii) that Isetan and Barney's entered into a general letter of intent regarding further business ventures between the partners on or as of March 8, 1989. With certain irrelevant exceptions, they do not contest that the remaining agreements were in fact entered into by the parties. They are deemed to have admitted those facts. *See* Local Bankruptcy Rule 7056–1; *Official Committee of Unsecured Creditors v. New York State Department of State (In re Operation Open City),* 148 B.R. 184, 188 n. 3 (Bankr.S.D.N.Y.1992), *aff'd,* 170 B.R. 818 (S.D.N.Y.1994). Defendants also claim that other material facts preclude the entry of partial summary judgment in movants' favor, including that the parties never intended to create any relationship other than that of lessor and lessee, that the terms of the leases are not atypical and do not provide IOA with a guaranteed preferred return on its investment, and that Barney's for all purposes and at all times acted and portrayed itself to the world as a lessee rather than an owner of the stores.

As a preliminary matter, defendants contend that only the Chicago, Beverly Hills and Madison Avenue New York leases and the joint investment agreements executed in connection with the Beverly Hills and Madison Avenue New York projects are relevant to this motion because, during an October 11, 1996 status conference on this matter, movants' counsel agreed that this motion would be based solely on the "four corners" of those agreements. We do not interpret counsel's statements during the status conference to so limit the evidence. Counsel merely indicated that movants' submissions would be confined to documentary evidence concerning Isetan's relationship with Barney's, as opposed to extrinsic evidence of the parties' intent. That is what movants have done.

Sections 365(d)(3) and (d)(4) of the Bankruptcy Code[1] apply only to "true" or

---

1. Those subsections provide as follows:

(3) The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for such performance shall not be extended beyond such 60–day period. This subsec-

tion shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

(4) Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause,

"bona fide" leases. *International Trade Administration v. Rensselaer Polytechnic Institute,* 936 F.2d 744, 748 (2d Cir.1991); *Liona Corp. v. PCH Associates (In re PCH Associates),* 804 F.2d 193, 198 (2d Cir.1986). By motion dated January 23, 1996, defendants sought to compel movants to pay post-petition rent and otherwise timely perform their obligations under the purported lease agreements. Pursuant to a series of stipulations approved by this court the parties agreed to defer consideration of that motion pending resolution of this adversary proceeding. Movants contend that *PCH Associates* is controlling in this case, and as applied herein, mandates that we find the purported lease agreements to be other than bona fide leases. At this point, they do not ask us to determine what they are. We cannot overstate the significance of this litigation to the conduct of these chapter 11 cases. If movants prevail on this motion or at trial, they need not pay post-petition rent to defendants under the agreements or comply with the other statutory requirements governing unexpired leases of non-residential real property. *See Rensselaer Polytechnic Institute,* 936 F.2d at 748 (agreement that is not true lease not rejected by operation of law despite trustee's failure to assume within 60 days); *PCH Associates,* 804 F.2d at 201 (§§ 365(d)(3) and (d)(4) do not apply to transaction that is not true lease). On the other hand, the increased financial burden on these estates in the event that movants are not successful would be considerable, and possibly crippling, particularly since they have not accrued funds sufficient to make post-petition payments to defendants.

■ We determine whether an agreement constitutes a lease for purposes of the Bankruptcy Code by reference to federal law. *See, e.g., City of Olathe, Kansas v. KAR Development Assocs., L.P. (In re KAR*

*Development Assocs., L.P.),* 180 B.R. 629, 638 (D.Kan.1995) ("the legislative history of § 502(b)(6), read together with § 365, shows Congressional intent that [federal law] be used to determine whether a real estate transaction should be characterized as a lease"), *stay denied,* 182 B.R. 870 (D.Kan. 1995); *In re Challa,* 186 B.R. 750, 757 (Bankr.M.D.Fla.1995). The appropriate inquiry is whether the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship. *See PCH Associates,* 804 F.2d at 200; *Rensselaer Polytechnic Institute,* 936 F.2d at 748; *Hotel Syracuse, Inc. v. City of Syracuse Industrial Development Agency (In re Hotel Syracuse, Inc.),* 155 B.R. 824, 838 (Bankr. N.D.N.Y.1993). We apply an "economic realities" test: while the parties to a transaction may intend that, as between themselves, their relationship be governed by the label they affix, that label neither governs the rights of third parties nor affects the legal consequences of the parties' agreement. *In re Best Products Co., Inc.,* 157 B.R. 222, 230 (Bankr.S.D.N.Y.1993) (citing *PCH Associates,* 804 F.2d at 198). We can consider parol evidence in determining the economic substance of the transaction. *PCH Associates,* 804 F.2d at 198.

■■ The burden of proof lies with the party challenging the bona fides of the lease. *PCH Associates,* 804 F.2d at 200; *Marriott Family Restaurants, Inc. v. Lunan Family Restaurants (In re Lunan Family Restaurants),* 194 B.R. 429, 450 (N.D.Ill.1996). The quantum of evidence necessary to satisfy that burden is "substantial". *PCH Associates,* 804 F.2d at 200. The Bankruptcy Code does not define the term "lease of real property". *PCH Associates* instructs that in ascertaining its meaning we should be guided by § 502(b)(6)'s [2] legislative history:

within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.
11 U.S.C. §§ 365(d)(3) and (d)(4).

**2.** That section limits claims arising from the termination of a lease of nonresidential real property as follows:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful

[T]he phrase "lease of real property" does not apply to lease financing transactions or to leases intended as security, but rather applies only to a "true" or "bona fide" lease. Thus, where the purported "lease" involves merely a sale of the real estate and the rental payments are, in truth, payments of principal and interest on a secured loan involving a sale of real estate, there is no true lease and section 502(b)(6) does not apply.

*PCH Associates*, 804 F.2d at 199 (citing S.Rep. No. 95–989, at 64, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5850; 3 COLLIER ON BANKRUPTCY ¶ 502.02[7][d], at pp. 502–63–502–64 (15th ed. 1986)).

Movants rely almost exclusively on *PCH Associates*. In that case, an experienced real estate investor learned that a hotel and the underlying real property were being offered for sale by the hotel owner and operator, an entity that eventually came to be known as PCH Associates. The investor determined that $9 million was necessary to acquire, renovate and provide working capital for the hotel. He then raised $4 million from other investors willing to acquire the owner entity's limited partnership interests and $5 million from an entity designated by a consortium of financial services companies. *Id.* at 194. The parties structured the $5 million investment as a tax-driven sale/leaseback transaction. PCH sold the underlying land to an entity that eventually became known as Liona Corp., N.V. Liona immediately leased back the property to PCH pursuant to a ground lease with an initial term of 33 years and an aggregate term with renewals of up to 165 years. *Id.* at 195. The rent under the ground lease consisted of a minimum annual rate plus a percentage of increases in the hotel's gross revenues. The parties adjusted the annual rent to ensure that Liona would receive 12% annual return on its "investment". Also, the ground lease expressly provided that the landlord would in no event be deemed a partner or associate of PCH and that the lease constituted the entire agreement between the parties. *Id.*

After PCH filed for chapter 11, Liona sought an order directing PCH to continue paying rent under the ground lease. PCH commenced an adversary proceeding seeking a declaration that the ground lease represented a joint venture or subordinate financing scheme rather than a non-residential real property lease within the scope of § 365. The bankruptcy court ruled for PCH, finding that the terms of the contract were ambiguous and included various features that were not commonly found in either actual sale agreements or true leases. In light of this ambiguity, the court relied on extrinsic evidence of the parties' intent in formulating the transaction to assess the true character of the transaction. *Id.* at 195–96. The district court affirmed.

On appeal, the second circuit affirmed the district court. It agreed that the ground lease between Liona and PCH was not a true lease, but took issue with any further determination by the lower courts as to the precise nature of the transaction. Despite the strong presumption that a deed and a lease are what they purport to be, the court found that there was "substantial evidence" pertaining to the "circumstances of the negotiations and the economic substance of the transactions" upon which the bankruptcy and district courts could rely to find that the transaction between Liona and PCH was something other than a true lease. *Id.* at 200. The court noted that the amount invested in the property was unrelated to the fair market value of the land, but was calculated solely to finance development of the

---

currency of the United States in such amount, except to the extent that—

\*   \*   \*   \*   \*   \*

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
  (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
  (i) the date of the filing of the petition; and
  (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
  (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates. . . .

11 U.S.C. § 502(b)(6).

hotel. It also noted that the rent was structured and intended to repay Liona's investment rather than compensate the landlord for use and occupancy of the land inasmuch as the minimum rent due under the ground lease was fixed at the lesser of $600,000 or 12% of Liona's investment. As such, the court concluded, the rent was unrelated to fair market rent. *Id.* at 201. The court also found other factors supporting characterization of the agreement as a financing transaction rather than a lease, including that PCH's agent initiated the transaction, the property was purchased specifically for PCH's use, PCH assumed many of the obligations associated with ownership, including the responsibility for paying property taxes and insurance, the agreement allowed Liona to recover its investment if the hotel debt were refinanced, and PCH had the right to pre-pay Liona's investment, at which time Liona would share solely in profits. *Id.*

Thus, the following factors were considered by the *PCH Associates* court in determining whether a purported lease is a "true" lease within the meaning of § 365:

(i) whether the "rental" payments compensate the lessor for use of the land as opposed to being structured for some other purpose, such as to ensure a particular return on an investment;

(ii) whether the purchase price is related to the fair market value of the land or calculated as the amount necessary to finance the transaction;

(iii) whether the property was purchased by the lessor specifically for the lessee's use;

(iv) whether the transaction is structured as a lease to secure certain tax advantages;

(v) whether the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance; and

(vi) whether the lessee can acquire the property at the expiration of the lease term for nominal consideration.

804 F.2d at 200–01; *see also In re Hotel Syracuse, Inc.*, 155 B.R. at 838 (citing *PCH Associates*).

■ Movants contend that application of these factors to the agreements at issue herein demonstrates that those agreements are not leases under § 365 of the Bankruptcy Code because: (a) the so called rent provides IOA with a guaranteed preferred return of 14% on its investment in each project, and does not compensate IOA for Barneys' use of the premises; (b) the Beverly Hills, Chicago and Madison Avenue New York stores were purchased and constructed specifically for Barneys' use; (c) the terms of the leases are unusually long; (d) Barney's, through Goldman Sachs, solicited Isetan for the purpose of developing the projects; (e) Barney's assumed the indicia of ownership because all of the leases are triple net, Barney's maintains the ground leases in Beverly Hills and Chicago by paying ground rent directly to the ground lessors, in Chicago, an affiliate of Barney's manages the property for no consideration, and in New York, IOA assigned to Barney's all of its voting rights as owner of the retail unit condominium and its right to appoint designees to the condominium's board of managers; and (f) except for the Chicago store sublease, each of the leases contains either a right of first refusal or a right of first offer in favor of the lessee, such that Barney's can prevent the transfer of IOA's purported ownership interest to any third party.

Defendants deny that the payments under the agreements are structured to provide IOA with a guaranteed preferred return equal to 14% of its investment. They claim that the basic, participation and bonus rent features of the agreements are common in retail lease transactions, that the 14% figure alluded to by movants is not a guaranteed preferred return, but a threshold or "override", after satisfaction of which the Pressman family interests, which, unlike Barney's, actually are joint venturers or partners in the Isetan real estate projects through Calireen, Newireen and Rush Oak, are permitted to share in the rental stream from the stores. They also assert that the rental stream from the stores has never met this threshold, nor was it ever anticipated to do so until many years after the leases were executed. Thus, they dispute movants' contention that the amount payable to defendants under the

leases is unrelated to prevailing market rents or the value of the land and improvements. They also assert that it is not uncommon in retail lease transactions for the lessee to contact the lessor and for the property to be constructed to the retail lessees' specifications. As to the alleged unusually long terms of the leases, the defendants state that Barney's, Barney's America and Madneer have the right to walk away from the leases after expiration of a much shorter initial term, such that Isetan and IOA, like any other landlord, bear the risk that they will be confronted with the need to find another tenant to occupy vacant space. Defendants also claim that triple net leases are not at all uncommon in modern commercial leasing transactions and that this feature alone is not an indication that an agreement is not a true lease. Although Barney's may have a right of refusal or first offer in the event that the lessors attempt to transfer their interests in the underlying properties, defendants contend that this purchase option is not "bargain" or nominal. In addition, they contend that Barney's has always treated these transactions as leases for accounting purposes and has otherwise never represented to the world that Barney's, Barney's America and Madneer are anything other than tenants.

As support for their allegations regarding the terms of the agreements and the economic substance of those provisions, defendants submitted an affidavit of Robert G. Von Ancken, a purported expert in the field of real estate and appraisal consulting, wherein Mr. Von Ancken opines that the various terms of the agreements are not at all uncommon in retail lease transactions. Among other things, he states that "[i]t should be emphasized in regard to rent and other terms that the market in which development and leasing of retail space occurs is not subject to rigid rules as to how parties must structure rent and otherwise allocate potential risks and rewards of property use and ownership." *See* Affidavit of Robert G. Von Ancken sworn to on November 6, 1996 ¶ 11. In a reply affidavit, he further opines that whether the terms of the agreements are viewed individually or collectively, their economic substance is that of true leases. *See*

Reply Affidavit of Robert G. Von Ancken sworn to on February 13, 1997 ¶¶ 3 and 4.

Defendants supplemented their original submissions herein with stipulated facts and a compendium of exhibits. For purposes of this motion, the parties do not dispute, among other things, that (i) movants' books and records show that Newireen or IOA paid for the real estate upon which the Chicago, Madison Avenue New York and Beverly Hills stores are situated and otherwise reflect that movants had certain rights manifesting a tenancy rather than ownership interest in those properties, (ii) the agreements in question were treated as leases in movants' books and records, which treatment Barney's believed to be appropriate for accounting purposes, (iii) IOA and Newireen became the owners of record of the properties at the time they were acquired, and neither Barney's nor Barney's America undertook any contractual obligation to fund those purchases, and (iv) prior to the commencement of litigation with defendants, movants orally and in writing portrayed the agreements and their obligations thereunder as leases and rent, respectively. Based upon these facts, defendants claim that we can draw inferences of fact that movants' position as to the "true" lease issue is inconsistent with their prior representations.

Movants argue that all of the foregoing is immaterial because the labels that the parties may have placed on the transactions in the past do not control. Without refuting Mr. Von Ancken's testimony with their own expert testimony, they assert that his testimony is immaterial to this motion because the issue currently before us is not whether the individual terms of the agreements appear commonly in documents labeled leases, but whether the terms of the transactions viewed collectively indicate that the alleged leases should not be treated as "true" lease for purposes of the Bankruptcy Code. Finally, movants deny that we need to find that a global partnership exists between Barney's and Isetan, a fact which defendants deny and contend in any case, can be proved or disproved only based upon extrinsic evidence concerning the parties' intentions.

Movants' position is untenable. On the one hand, they claim that the individual terms of the agreements are immaterial and that we must look to the bigger picture to determine the true economic substance of the transaction. On the other, they seek to limit the scope of that picture to the four corners of documents whose terms, we are told in Von Ancken's unrefuted testimony, either individually or taken as a whole reflect the economic substance of a "true" lease. To be sure, analysis of the leases in accordance with the *PCH Associates* factors indicates that they contain terms and were entered into under circumstances that may not be commonly associated with true leases of real property. However, movants would have us mechanically apply those factors without considering evidence concerning either prevailing conditions in the retail leasing marketplace or changes in the way that those transactions are structured that may have taken place since our court of appeals rendered its decision. We are loathe to exercise such blind adherence. Moreover, it is particularly ill-advised in light of our court of appeals' subsequent decision in *Rensselaer Polytechnic Institute*, wherein it rejected the assertion that when a purported lease is "triple net", this factor should be conclusively established against the "true" lease nature of the transaction due to the increasingly common utilization of this feature in commercial leases. 936 F.2d at 751.

Summary judgment on the issue of whether a lease is a "bona fide" lease under § 365(d)(3) and (4) may be appropriate under certain circumstances. *See, e.g., AgriStor Leasing v. Bertholf*, 753 F.Supp. 881 (D.Kan. 1990); *Beech Acceptance Corp., Inc. v. Connell*, Nos. 88–1080–C and 88 1575–C, 1990 WL 129448 (D.Kan.1990); *In re Lykes Bros. Steamship Co., Inc.*, 196 B.R. 574 (Bankr. M.D.Fla.1996); *In re Hotel Syracuse, Inc.*, 155 B.R. at 831. To this end, we note that *PCH Associates* was resolved after a three day trial on the merits, including extensive expert testimony, in which the court admitted parol evidence on the parties' intention in entering into the underlying transactions. Likewise, *Rensselaer Polytechnic Institute* was not a summary judgment case, and in any event, required the court to construe one ground lease. In *Hotel Syracuse,* the court construed one lease and the parties stipulated to the underlying facts. *See* 155 B.R. at 832.

Where extrinsic evidence is required to determine the intent of the parties in a purported lease transaction, however, summary judgment may be denied. *See Feldman v. First National City Bank,* 368 F.Supp. 1333, 1339 (S.D.N.Y.1974), *rev'd on other grounds,* 511 F.2d 460 (2d Cir.1975). We find that to be the case here. We cannot conclude, based solely on the documentary evidence submitted by movants, that the agreements governing the Chicago, Beverly Hills and Madison Avenue New York projects are not "true" leases.

### Conclusion

We deny movants' motion for partial summary judgment.