In re **HOMEPLACE STORES, INC.,** Homeplace Stores Two, Inc., Homeplace Management, Inc., and Homeplace Holdings, Inc., Debtors.

Bankruptcy Nos. 98–8, 98–10, 98–11 and 98–12(PJW).

United States Bankruptcy Court, D. Delaware.

Dec. 4, 1998.

Laura Davis Jones, Victoria Watson Couni-
han, Young, Conaway, Stargatt & Taylor,
LLP, Wilmington, DE, Luc A. Despins, Den-
nis F. Dunne, Milbank, Tweed, Hadley &
McCloy, New York City, for HomePlace
Stores, Inc., et al., debtors and Debtor–in–
Possession.

William H. Sudell, Jr., Robert J. Dehney,
Gregory W. Werkheiser, Morris, Nichols,
Arsht & Tunnell, Wilmington, DE, for The
Official Committee of Unsecured Creditors.

Jeoffrey L. Burtch, Cooch and Taylor, Wil-
mington, DE, Robert J. Sidman, Terry M.
Miller, Vorys, Sater, Seymour and Pease,
LLP, Columbus, OH, for National City Leas-
ing Corporation.

Stephen M. Miller, Smith, Katzenstein &
Furlow, LLP, Wilmington, DE, Alan R. Le-
pene, Thompson, Hine & Flory, LLP, Cleve-
land, OH, for Maxus Leasing Group, Inc.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

Before the Court is the motion (Doc.
# 1224) of National City Leasing Corpora-
tion ("National City") and Maxus Leasing
Company ("Maxus" and, for convenience of
reference, together with National City, the
"Lessors") for partial summary judgment
that certain agreements entered into be-
tween the Lessors and HomePlace Holdings,

Inc. ("HomePlace") constitute true leases and not disguised security agreements under applicable Ohio law. For the reasons stated below, I will deny the Lessors' motion for partial summary judgment.

## FACTS

HomePlace and Maxus entered into a Master Lease Agreement dated October 17, 1995 in which Maxus agreed to lease to HomePlace certain furniture, fixtures, and equipment. (Doc. # 1265, Ex. A) Subsequent deliveries to HomePlace of personal property covered by the Master Lease Agreement are the subject of a number of Schedules which are deemed a part of the Master Lease Agreement.

Between January and July of 1996, Maxus and National City entered into various agreements under which National City loaned sums to Maxus in exchange for the right to receive payments from HomePlace under the Master Lease Agreement. HomePlace entered into an agreement with Maxus in which, *inter alia,* HomePlace received notice of the assignment in favor of National City.

On January 5, 1998, HomePlace and its three corporate affiliates filed petitions for relief under Chapter 11 of the United States Bankruptcy Code. The Lessors filed motions seeking an order to compel HomePlace to pay postpetition obligations due under the Master Lease Agreement pursuant to 11 U.S.C. § 365(d)(10). HomePlace objected to the motions on the ground that the Master Lease Agreement was not a true lease but a security agreement outside the scope of § 365(d)(10).[1] The parties agreed to adjourn a trial on the merits of the Lessors' motion for payment under § 365(d)(10) pending a decision of this Court on the question of whether the Master Lease Agreement, solely by reference to its wording, constitutes a true lease. (Doc. # 1225 at ¶ 4)

As recited in the Lessors' brief, the Master Lease Agreement contains the following provisions which, according to the Lessors, show the existence of a true lease:

1. "Lessor and Lessee agree, and Lessee represents for the benefit of Lessor and its Assignee(s) that the Lease is intended to be a 'finance lease' and not a 'lease intended as security' as those terms are used in the Uniform Commercial Code and that the Lease is intended to be 'true lease' as the term is commonly used under the Internal Revenue Code of 1986, as amended." (Section 9(b) of the Master Lease)

2. "Lessee has no interest in the Equipment except as expressly set forth in the Lease, and that interest is a leasehold interest." (Section 9(b) of the Master Lease)

3. "The parties agree that this lease is a 'Finance Lease' as defined by Section 2A–103(g) of the Uniform Commercial Code ('UCC'). Lessee acknowledges that either (a) that Lessee has reviewed and approved any written Supply Contract (as defined by UCC 2A–103(y)) covering the Equipment purchased from the 'Supplier' (as defined by UCC 9A–103(x)) thereof for lease to Lessee [sic] or (b) that Lessor has informed or advised Lessee, in writing, either previously or by this Lease of the following (i) the identity of the Suppliers; (ii) that the Lessee may have rights under the Supply Contract; and (iii) that the Lessee may contact the supplier for a description of any such rights Lessee may have under the Supply Contract." (Section 6 of Master Lease).

4. "The Lease is a net lease, it being the intention of the parties that all costs, expenses, and liabilities associated with the Equipment or its lease shall be

---

1. § 365(d)(10) provides, in pertinent part:
The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual pri-

marily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof.

borne by Lessee." (Section 5 of the Master Lease)

5. "It is the express intention of the Lessor and Lessee that all rent and other sums payable to Lessee under the Lease shall be, and continue to be, payable in all events throughout the terms of the Lease. The Lease shall be binding upon the Lessee, its successors and permitted assigns ..." (Section 5 of the Master Lease)

6. "Lessee's obligations under the Lease with respect to Assignee shall be absolute and unconditional and not be subject to any abatement, reduction, recoupment, defense, offset or counterclaim for any reason ..." (Section 11 of the Master Lease)

7. "Lessee represents and warrants to Lessor and its Assignee(s)(i) that the execution, delivery and performance of this Master Agreement and Lease was duly authorized and that upon execution of this Master Agreement and the Lease by Lessee and Lessor, the Master Agreement and the Lease will be in full force and effect and constitute a valid legal and binding obligation of the Lessee, and enforceable against the Lessee in accordance with its respective terms." (Section 16 of the Master Lease)

8. "The foregoing representations and warranties shall survive the execution and delivery of the Lease and any amendments hereto and shall upon the written request of Lessor be made to Lessor's Assignee(s)." (Section 16 of the Master Lease)

9. "The Master Agreement and the Lease constitute the entire and only agreement between Lessee and Lessor with respect to the lease of the Equipment, and the parties have only those rights and have incurred only those obligations as specifically set forth herein." (Section 19 of the Master Lease)

10. "Lessee acknowledges that Lessor shall be entitled to claim for federal income tax purposes (i) deductions (hereinafter called 'Depreciation Deductions') on Lessor's cost of the Equipment for each of its tax years during the term of the Lease under any method of depreciation or other cost recovery formula permitted by the Internal Revenue Code.... Lessee agrees to take no action inconsistent (including the voluntary substitution of Equipment) with the foregoing or which would result in the loss, disallowance, recapture or unavailability to Lessor of Depreciation, Deductions or Interest Deductions." (Section 18 of the Master Lease)

11. "The Lease constitutes the entire and final agreement between the Lessor and Lessee and may not be contradicted by evidence of prior, contemporaneous or subsequent oral discussions, negotiations or agreements of the parties." (Section 20 of the Master Lease)

(Doc. # 1265 at 11–14).

For purposes of the Lessors' partial summary judgment motion, the parties have stipulated the following facts:

1. HomePlace reviewed the principal economic terms of the Master Lease Agreement with Ernst & Young before it entered into the transactions with Maxus; (Doc. # 1225 at ¶ 11(a))

2. HomePlace had the opportunity to review and approve the terms of the Lease and the Lease is a product of a good faith arm's-length transaction between unrelated commercial entities; (Doc. # 1225 at ¶ 11(b))

3. HomePlace desired operating lease treatment for accounting purposes and agreed to treat the Lease as a true lease for tax purposes pursuant to provisions of the Lease; (Doc. # 1225 at ¶ 11(c))

4. At all relevant times, Maxus treated the lease as a capital lease; (Doc. # 1225 at ¶ 11(d))

5. HomePlace treated the Lease as an operating lease on its audited financial statements for fiscal years ended 1996 and 1997, and treated it as a capital lease for fiscal year ended 1998; (Doc. # 1225 at ¶ 11(e))

6. HomePlace treated the Lease as a true lease under the Internal Revenue Code on its tax returns for fiscal years 1996 and 1997, as did Maxus. (Doc. # 1225 at ¶ 11(f))

## DISCUSSION

Federal Rule of Bankruptcy Procedure 7056 makes applicable Rule 56 of the Federal Rules of Civil Procedure in adversary proceedings. Under FRCP Rule 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In the present case, because the facts set forth have been stipulated by the parties, this Court may properly grant summary judgment if either party is entitled to judgment as a matter of law. *See AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.,* 84 F.3d 622, 624 (2d Cir.1996).

The question posed in this case has been framed by the parties in their stipulation as:

[W]hether the Master Lease Agreement, dated October 17, 1995, between the parties (including the riders and schedules thereto, the "Lease") is a true lease under the Uniform Commercial Code and applicable law (the "UCC") because of the parties' agreements and representations contained in the Lease, including without limitation sections 6 and 9(b) thereof. Specifically, National City and Maxus will ask the Court to rule that, as a matter of law and notwithstanding the ultimate resolution of any disputed fact at issue, the provisions in the lease regarding the parties' intent to create a true lease under the UCC are determinative of the ultimate characterization and treatment of the Lease in these Bankruptcy cases.

(Doc. # 1225 at ¶ 7)

Thus, this Court is not, in ruling on this motion, deciding how to characterize the Master Lease Agreement based on the factors enumerated in UCC § 1–201(37) and the relevant case law. The only issue for decision is whether, given the parties' agreements and representations in the Master Lease Agreement, those agreements and representations are determinative, under applicable law, of the proper characterization and treatment of the Master Lease Agreement.

■ The determination of whether the Master Lease Agreement should be characterized as a true lease or a security agreement is governed by state law. *See In re Continental Airlines, Inc.,* 932 F.2d 282, 294 (3d Cir.1991); *In re Edison Bros. Stores, Inc.,* 207 B.R. 801, 807 (Bankr.D.Del.1997). The Master Lease Agreement provides that "the Lease shall in all respects be governed by, and construed in accordance with, the laws of the State of Ohio." (Doc. # 1265, Ex. A at ¶ 19) Thus, the Master Lease Agreement clearly states, and the parties agree, that Ohio law governs.

The provisions of UCC § 1–201(37) are considered in distinguishing a true lease from a security agreement. Prior to 1992, Ohio's version of UCC § 1–201(37), found at Ohio Rev.Code § 1301.01(KK), read in relevant part:

Whether a lease ... is intended as security is to be determined by the facts of each case, except that (a) the inclusion of an option to purchase does not of itself make the lease one intended as security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

In 1992, the Ohio legislature amended Ohio Rev.Code § 1301.01(KK) to conform to changes made to UCC § 1–201(37) in 1987. The Ohio statute, as amended in 1992, reads in relevant part:

Whether a transaction ... creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee and if any of the following applies:

(a) The original term of the lease is equal to or greater than the remaining economic life of the goods.

(b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods.

(c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(d) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.[2]

Referencing the eleven provisions recited on pages 4 through 6 above as found in the Master Lease Agreement, the Lessors state their position as follows:

The Court's inquiry into the nature of the transaction in this case must begin, and should end, with examination of the language the parties chose and set forth in the Lease. And because that language is so clear, so unambiguous, and so consistent in its expression that what the parties believed and wanted was a "true" lease, under the principles of Ohio law, this Court should not inquire further.

(Doc. # 1265 at 11)

According to the Lessors, the matter before me calls for the application of principles of contract interpretation, and Ohio law exalts the sanctity of contract terms. *Blount v. Smith,* 12 Ohio St.2d 41, 231 N.E.2d 301, 305 (Ohio 1967) ("The right to contract freely with the expectation that the contract shall endure according to its terms is as fundamental to our society as the right to write and to speak without restraint.") Further, according to the Lessors, there is no reason to suppose that by enacting UCC § 1-201(37), the Ohio General Assembly meant to turn established Ohio contract law on its head and to cast doubt upon the real nature and legal incidents of every transaction termed a lease.

In response, HomePlace argues that the 1987 amendment to UCC § 1-201(37) effected a fundamental change in the law and that the Lessors' position exalts form over substance by ignoring the clear mandate of the extant UCC § 1-201(37).

The 1987 revisions to UCC § 1-201(37), as reflected in the 1992 amendment to Ohio Rev.Code § 1301.01(KK), shifted the focus of the characterization issue to the economics of the transaction by deleting all references to the parties' intent. The Editor's Note to the 1987 Amendment states that "[r]eference to the intent of the parties to create a lease or security interest has led to unfortunate results.... Accordingly, amended Section 1-201(37) deletes all reference to the parties' intent.... All of these [newly-codified] tests focus on economics, not the intent of the parties." UCC § 1-201(37) Off.Cmt. (amended 1987); *see also Hanes v. Vital Prods. Co. (In re Vital Prods. Co.),* 210 B.R. 109, 112 (Bankr.N.D.Ohio 1997) (applying Ohio law) ("[T]he present version of UCC § 1-201(37) has shifted the focus from 'the intent of the parties' to the economic realities of a given transaction....").

Several commentators have recognized that, as a result of the 1987 amendment to UCC § 1-201(37), the intent of the parties is no longer a factor in an analysis under § 1-201(37). Commenting on the analysis under revised § 1-201(37), Professors White and Summers advise that "[w]hether a document is a security agreement as opposed to a lease ... is dependent on certain factors extrinsic to the document and not capable of control by words in the document." 2 James J. White & Robert S. Summers, Uniform Commercial Code 565 (4th ed. 1995 & Supp. 1998). Professors White and Summers, in commenting on the old version of § 1-201(37) which asks whether the lease "was intended as security", state that the old version of the section "focus[ed] improperly on the actual, subjective intention of the parties when they drafted the contract, rather than on the substance of the transaction." 4 White and Summers, *supra,* at 11. Another commentator, in remarking on the 1987 amendment, states that:

**2.** Factors (a) through (d) are sometimes referred to as the "bright line" tests.

[w]hat had been a test of intention has become a test of economic realities; that is, intention has been dropped from section 1–201(37).... Thus, the parties to a transaction may create a secured transaction under the revised definition even though their every intention was to create a lease.... The parties' intention and the agreement's style and language are nearly unimportant.

Richard L. Barnes, Distinguishing Sales and Leases: A Primer on the Scope and Purpose of UCC Article 2A, 25 U.Mem.L.Rev. 873, 882–84 (1995).

 I am persuaded by this clear weight of authority that the intent of the parties, no matter how clearly spelled out in the parties' representations within the agreement, can not control the issue of whether the agreement constitutes a true lease or a security agreement.

The Lessors cite *American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248 (5th Cir.1981), as being "[t]he closest situation to that at hand." (Doc. # 1265 at 18) Although the *American Standard* court held that, under the old version of § 1–201(37), the transaction at issue was a true lease based in part on a recital in the writing that the lease was intended to be a true lease, the court stated that "[s]uch recitals are not conclusive."[3] *Id.* at 266. Given the court's acknowledgment that an unequivocal statement of true lease intent was not a conclusive factor, coupled with the fact that the case was decided under the old version of § 1–201(37), I find *American Standard* to be unpersuasive authority in the matter before me.[4]

 As noted above, the Lessors cite cases for the proposition that "Ohio law exalts the sanctity of contract," suggesting that HomePlace should not be rewarded for "abruptly changing its tune" on the Master Lease Agreement's characterization "to the potential detriment" of the Lessors. (Doc. # 1265 at 16) Although protecting "contractual sanctity" is a desirable goal in a two-party contractual dispute, it is not the controlling factor under the UCC, which explicitly constrains contracting parties from destroying the rights of third parties through language included in a security agreement. Official Comment to UCC § 1–102(3) states that:

[t]he meaning of the statute itself must be found in its text, including its definitions, and in appropriate extrinsic aids; it cannot be varied by agreement.... Thus private parties cannot make an instrument negotiable within the meaning of Article 3 ... nor can they change the meaning of such terms as "bona fide purchaser," "holder in due course," or "due negotiation," as used in this Act.

UCC § 1–102(3) (adopted by the Ohio legislature as Ohio Rev.Code § 1301.02 Off. Cmt.2). In *In re Phoenix Pipe & Tube, L.P.*, 1993 WL 204165 (E.D.Pa. June 8, 1993), the court held that, citing to Pennsylvania's version of § 1–102(3) and its comments, parties were barred "from varying in the Agreement the substantive definition of 'security interest'" as stated in Pennsylvania's version of § 1–201(37). *Id.* at *3. White and Summers, in addressing UCC § 1–102(3), state that "while modification [of Article 2's specific third-party protection provisions] should be permissible between parties to the modification, their effect on third parties should not be changed without the agreement of those parties." 1 White and Summers, *supra*, at § 3–11. Thus, although parties should generally be free to bind themselves to contractual terms, the UCC does not grant the Lessors the power to defeat the rights of third parties to challenge the characterization of the Master Lease Agreement by "opt-

---

3. The pertinent lease recital read: The parties "agree that this Lease is and is intended to be a true lease (and not a lease intended as a security interest) and further agree to treat same as a true lease for all purposes...." *Id.* at 266.

4. The Lessors only cite two other UCC recharacterization cases—*Interpool Ltd. v. Char Yigh Marine*, 890 F.2d 1453 (9th Cir.1989) and *Martin Bros. Toolmakers, Inc. v. Industrial Dev. Board (In re Martin Bros. Toolmakers, Inc.)*, 796 F.2d 1435 (11th Cir.1986). Like *American Standard*, both cases were decided under the old version of UCC § 1–207(37). Thus, to the extent that those cases focus on the intent of the parties to be a factor in considering the recharacterization issue, they are outdated.

ing out" of the definition of a security interest under UCC § 1–201(37).

HomePlace argues that the Lessors' motion for summary judgment must be denied because HomePlace cannot be deprived of the opportunity to prove that the bright line tests set forth in § 1–201(37) require the agreement to be characterized as a security agreement. This argument is compelling given that, as noted above, the parties could not opt out of § 1–201(37). In *Phoenix Pipe,* after finding that the parties could not waive the application of the UCC, the court stated that "even if FNB's waiver argument were accepted, the balance of this agreement's features would still distinguish it as a security transaction." [5] *Phoenix Pipe,* 1993 WL 204165, *3. Thus, the court in *Phoenix Pipe* considered the economic realities of the transaction and went beyond a consideration of only the agreement's language. To prevent HomePlace from presenting evidence under the bright-line tests of § 1–201(37) would run counter to § 1–201(37)'s dictate that facts beyond the language of the document are relevant to characterizing an agreement as a true lease or a security agreement.

The Lessors argue that the Master Lease Agreement is not merely a contractual document "labeled" as a lease. They lay great emphasis on the above quoted eleven specific provisions of the Master Lease Agreement as clear evidence that contractually binds the parties to giving the document a true lease effect. I do not believe that these numerous statements in the Master Lease Agreement present a situation any different from the single "true lease" statement found in *Phoenix Pipe.* No matter how expressed or how often expressed, the parties cannot will away the application of UCC § 1–201(37).

██ The Lessors submit that the doctrine of equitable estoppel should apply to prevent HomePlace from recharacterizing what the parties had denominated in the agreement as a true lease. However, courts have held that the defense of equitable estoppel is not available against debtors-in-possession when the

defense would operate at the expense of the debtor's creditors. *See In re Howards Appliance Corp.,* 91 B.R. 208, 212 (E.D.N.Y. 1988) ("[C]reditor could not assert equitable estoppel against ... debtor-in-possession since [it] was stripped by the Bankruptcy [Code] of any knowledge of the creditor's security interest."); *I.A. Durbin, Inc. v. Jefferson Nat'l Bank (In re I.A. Durbin, Inc.),* 46 B.R. 595, 602 (Bankr.S.D.Fla.1985) (" 'One of the purposes for providing the ideal creditor status is to prevent such defenses as estoppel from being raised against the Trustee [or debtor-in-possession].' ") (quoting *In re Brent Explorations, Inc.,* 31 B.R. 745, 749 (Bankr.D.Colo.1983)); *Wolfe v. Ebert,* 37 B.R. 934 (D.S.C.1983). In *Wolfe,* the debtors asserted the defense of usury on a note that they had negotiated and drafted. The court rejected the noteholder's argument that the debtors were equitably estopped from asserting a usury defense, stating that:

> [t]his contention overlooks the bankruptcy considerations involved. Allowance of the usurious claim for interest ... would reduce the funds available for payment of other claims against the debtors, thereby favoring the claimant at the expense of the debtors' other creditors.... Since the usury defense is in the best interest of all creditors, the debtors are not estopped from asserting the defense of usury.

*Id.* at 937. Similar to the court's reasoning in *Wolfe,* treatment of the Master Lease Agreement as a true lease would reduce the funds available for payment to other creditors because payments under assumed leases are entitled to administrative expense priority. Thus, because recharacterization of the Master Lease Agreement would be in the best interest of the creditors, HomePlace, as debtor-in-possession, should not be estopped from asking this Court to do so.

██ Even if HomePlace, as debtor-in-possession, is estopped from recharacterizing its agreement with the Lessors, the defense of equitable estoppel would not apply to the debtor-in-possession's creditors. Ohio law

---

**5.** The agreement in *Phoenix Pipe* contained lease language similar to the case at bar: "Lessor and Lessee intend that this Lease be constructed as creating a Lease of the Equipment and not as

creating a secured transaction under the Uniform Commercial Code." *Phoenix Pipe,* 1993 WL 204165, *1.

does not allow the defense of equitable estoppel to bind parties not in privity to the contract. *See, e.g., Andres v. City of Perrysburg,* 47 Ohio App.3d 51, 546 N.E.2d 1377, 1383 (Ohio App.1988). HomePlace's creditors, represented in this dispute by the unsecured creditors' committee, are not in privity with either HomePlace or the Lessors vis-a-vis the Master Lease Agreement and, thus, have no connection to the Master Lease Agreement that would warrant extending the estoppel defense to them.

## CONCLUSION

For the reasons stated above, the Lessors' motion for partial summary judgment is denied.