## In re INTEGRATED HEALTH SERVICES, INC., et al., Debtors.

### Nos. 00–389 (MFW) through 00–826 (MFW).

United States Bankruptcy Court, D. Delaware.

March 13, 2001.

---

James A. Patton, Robert S. Brady, Joel A. Waite, Edmon L. Morton, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Michael C. Crames, Arthur Steinberg, Marc D. Rosenberg, Kaye Scholer Fierman Hays & Handler, LLP, New York City, for Integrated Health Services, Inc., et al.

Joanne B. Wills, Steven K. Kortanek, Maria Aprile Sawczuk, Klehr Harrison Harvey Branzburg & Ellers LLP, Wilmington, DE, Glenn Rice, William Silverman, Otterbourg Steindler Houston & Ro-

sen, PC, New York City, for the Official Committee of Unsecured Creditors.

Brett D. Fallon, Morris James Hitchens & Williams LLP, Wilmington, DE, James J Robinson, Timothy M. Lupinacci, C. Travis Maxwell II, Burr & Forman LLP, Birmingham, AL, for SouthTrust Bank.

Daniel K. Astin, Maria Giannarakis, Office of the United States Trustee, Philadelphia, PA.

## OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the motion of South-Trust Bank, N.A. ("SouthTrust") for relief from the automatic stay or for adequate protection payments. Alternatively, SouthTrust seeks a determination that it is entitled to payment of rent under an assignment of leases pursuant to section 365(d)(3). We find that SouthTrust is an undersecured creditor and that the collateral is not depreciating. We therefore conclude that SouthTrust is not entitled to relief from the stay. We find, however, that the leases are not a financing arrangement. Therefore, SouthTrust is entitled to the payment of rent on each of the properties, pursuant to its assignment of rents.[2]

## I. BACKGROUND

In June, 1998, SouthTrust loaned $53 million to six subsidiaries of Integrated Health Services, Inc. (collectively, "the Subsidiaries"). The loan was used to purchase six nursing home facilities. Each facility was owned by a separate subsidiary. The loan agreements provided that the Subsidiaries would lease the properties to IHS Acquisition No. 151, Inc. ("Acquisition"), which would operate the facilities.[3] To secure the $53 million loan, the Subsidiaries granted SouthTrust a mortgage on each facility and an assignment of the rents and leases on those facilities. The mortgages and financing statements were all properly filed, and the liens were duly perfected.

The Debtors subsequently "collapsed" the Subsidiaries' operations and leases for accounting purposes. That is, on the Debtors' records there was no separate accounting for payment of rent from Acquisition to the Subsidiaries or for repayment of the loan to SouthTrust by the Subsidiaries. Acquisition made the monthly payments due on the loan directly to SouthTrust. At no time prior to, or after, the loan did the Debtors inform SouthTrust that they were collapsing the leases. Nor did the Debtors advise South-Trust that the Subsidiaries would not be receiving any rent.

On February 2, 2000, the Debtors filed voluntary petitions under Chapter 11. As of the petition date, the principal balance due on the loan was $51,336,802.60 (plus interest, attorneys fees, and costs). SouthTrust asserts (and the Debtors do not dispute) that the Debtors have failed

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2. In their post-hearing brief, SouthTrust raised two other issues: first, whether the Debtors may even argue that the leases are not true leases because of a conflict of interests among the Debtors, and second, whether

the Debtors have improperly substantively consolidated the bankruptcy estates. Because we conclude that the Debtors must pay all post-petition rent pursuant no section 365(d)(3), we need not address those issues.

3. Acquisition has all the authorizations, certifications, permits, and licenses necessary to operate the healthcare facilities under federal and state law. Acquisition is the only entity which receives reimbursement under Medicare and Medicaid for those facilities.

to pay SouthTrust since March, 2000. SouthTrust asserts that the Debtors' failure to make the monthly payment due under the loan constitutes "cause" for lifting the automatic stay. SouthTrust supplemented its original motion to assert that Acquisition's failure to make rent payments violates section 365(d)(3). The Debtors opposed the motions. A hearing was held on August 4, 2000, and post-trial briefs were submitted by the parties.

## II.  JURISDICTION

This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), (b)(2)(G), and (b)(2)(O).

## III.  DISCUSSION

### A.  Relief from the Automatic Stay or Adequate Protection

■ In its motion, SouthTrust asserts that the Debtors continue to use the collateral without making any ongoing payments and that the value of its collateral is depreciating. SouthTrust asserts that it is entitled to adequate protection payments or relief from the automatic stay.

In its objection to SouthTrust's motion, the Debtors assert that they need not make adequate protection payments to SouthTrust because it is an undersecured creditor whose collateral is not depreciating in value. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 382, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). SouthTrust concedes that it is undersecured. Therefore, to determine that SouthTrust is entitled to adequate protection payments, we must find that SouthTrust's collateral is declining in value.

SouthTrust's group vice president of specialized healthcare lending, Laura McDonald, testified that there has been a decline in the payor mix, census and profit-ability at the facilities. Ms. McDonald could not, however, testify as to whether or how that translated into a decline in the value of the properties.

Additionally, SouthTrust's appraiser, Stan Phillips, made only one appraisal of the properties. Therefore, he could testify only as to the static value of the properties. Furthermore, in his review of the net operating income of the facilities, Mr. Phillips testified that the total net operating income for the six facilities would increase, not decline. (*See* Debtor's Exhibit 8.) Mr. Phillips' conclusions were reinforced by the Debtors' expert, Wade Collins, who also projected increasing revenues at the facilities. Furthermore, according to Mr. Collins' testimony, there is a direct correlation between an increase in net operating income and the value of the property.

Based upon the evidence before the Court, we cannot conclude that the value of SouthTrust's collateral is declining. Therefore, SouthTrust is not entitled to relief from the automatic stay or to adequate protection payments under sections 362 and 361, respectively. *Timbers of Inwood,* 484 U.S. at 382, 108 S.Ct. 626.

### B.  Post–Petition Rents under Section 365(d)(3)

In its Supplement, SouthTrust asserts that the assignment of rents provides it rights in addition to its rights as a secured creditor under the mortgages. Specifically, it asserts that it is entitled to payment of rents due under the leases as a result of its assignment of rents agreement.

■ An assignment of rents clause transfers the right in the rents to the assignee. *See, e.g., Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34, 38 (3d. Cir.1993)(upon default and exercise of rights under assignment of rents clause,

title to rents vested in banks, not debtor); *Federal Deposit Ins. Corp. v. Int'l Property Mgmt., Inc.,* 929 F.2d 1033, 1038 (5th Cir.1991) (under Texas law, assignment of rents agreement provided for title to rents to pass to assignee automatically upon default).

While the Debtors were not in default as of the petition date, SouthTrust asserts that the assignment of rents provision still requires that it be paid. Section 365(d)(3) requires that a debtor timely perform all of its obligations under an unexpired lease of nonresidential real property until the lease is assumed or rejected. Therefore, SouthTrust asserts, Acquisition must make all post-petition rent payments it owes to the Subsidiaries under the leases. Since those rents have been assigned to South-Trust, SouthTrust asserts section 365 mandates that Acquisition pay the post-petition rent to it.

■ The Debtors do not contest South-Trust's rights to any rents due under the leases. Rather, the Debtors raise only one defense: section 365(d)(3) is not applicable here because the agreements between Acquisition and the Subsidiaries are not true leases but merely financing arrangements. *See, e.g., Liona Corp. v. PCH Assoc. (In re PCH Assoc.),* 804 F.2d 193, 200 (2d Cir. 1986) (section 365(d)(3) and (4) are not applicable to disguised financing arrangements). Accordingly, the Debtors assert that Acquisition does not have to make any monthly post-petition payments to the Subsidiaries or SouthTrust.

■ In determining whether a lease is a bona fide, or true, lease, the form or title chosen by the parties is not determinative. *See, e.g., PCH Assoc.,* 804 F.2d at 198; *Barney's Inc. v. Isetan Co., Ltd. (In re Barney's Inc.),* 206 B.R. 328, 332 (Bankr.S.D.N.Y.1997); *In re Lansing Clarion Ltd. Partnership,* 132 B.R. 845, 850 (Bankr.W.D.Mich.1991). The party

challenging the bona fides of the lease carries a "substantial" burden of proof. *See, e.g., PCH Assoc.,* 804 F.2d at 200; *Barney's,* 206 B.R. at 332. Thus, it is the Debtors' burden to show that the agreements between the Subsidiaries and Acquisition are not true leases.

The parties assert different bases for determining whether the agreements are true leases or financing arrangements. The Debtors assert that we should apply federal law in determining whether the agreements are true leases or financing arrangements, and SouthTrust asserts that we should apply state law. *See, e.g., Westship, Inc. v. Trident Shipworks, Inc.,* 247 B.R. 856, 862 n. 7 (M.D.Fla.2000) (citing cases which apply federal law and cases which apply state law).

The Debtors assert that we must decide whether agreements are true leases or financing agreements according to the economic substance test. *See, e.g., PCH Assoc.,* 804 F.2d at 199 (*citing Sun Oil Co. v. CIR,* 562 F.2d 258, 263 (3d Cir.1977)) ("[W]e look to the economic realities of the leases and not to the labels applied by the parties"); *In re MCorp Fin., Inc.,* 122 B.R. 49, 52–53 (Bankr.S.D.Tex.1990); *Edison Brothers,* 207 B.R. at 809. That test includes examining all relevant circumstances and the economic substance of the agreement to discern the true nature of the instrument. *See, e.g., PCH Assoc.,* 804 F.2d at 199; *Chicago Coastal Motor Express, Inc.,* No. 92–60070, 1992 WL 309184, at *13 (Bankr.N.D.Ind. June 3, 1992).

SouthTrust asserts that state law governs whether an agreement is a true lease or a disguised security agreement. *See, e.g., In re Homeplace Stores, Inc.,* 228 B.R. 88, 92 (Bankr.D.Del.1998). According to section 25 of the leases between the Subsidiaries and Acquisition, Texas law governs.

The Third Circuit has suggested, but not decided, that courts apply state law in determining whether an agreement is a true lease or a disguised security interest:

> We note that when Congress discussed the definition of "security interest" under the Bankruptcy Code, it noted that "[w]hether a consignment or a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable State or local law." House Report at 314; Senate Report at 26, 1978 U.S.Code Cong. & Admin.News 5812, 6271.

*In re Continental Airlines, Inc.*, 932 F.2d 282, 294 (3d Cir.1991).

We conclude that it is immaterial which law is applied because the difference between the two tests is not significant here. The economic substance test requires that we examine all of the circumstances and documents, and Texas law requires that we evaluate "the facts of each case." *See* Tex.Bus. & Com. § 1.201(37).

■ In determining whether an agreement is a true lease or a disguised financing agreement, the majority of courts focus upon three factors: whether the lessee has a purchase option at the end of the lease and, if so, whether the option price is nominal; whether the aggregate rental payments have a present value equal to or in excess of the original cost of the leased property; and whether the lease term covers the useful life of the property. *See, e.g., In re Edison Brothers Stores, Inc.*, 207 B.R. 801, 809–10 & nn. 8–10 (Bankr. D.Del.1997). *See also* Tex.Bus. & Com. § 1.201(37)(B) & (C).

■ In addition to those three factors, courts have examined a number of other indicia, including whether the "rental" payments were calculated to compensate the lessor for the use of the property, rather than ensure a return on an investment; whether the "rent" was calculated at market rate; whether the obligations of the tenant are those normally associated with ownership; whether the property was purchased by the lessor specifically for the lessee's use; and the intent of the parties, including whether the agreement was structured to secure tax advantages and the purpose of the lease in light of the entire transaction. *See, e.g., PCH Assoc.*, 804 F.2d at 200–01; *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.)*, 155 B.R. 824, 838–39 (Bankr.N.D.N.Y.1993). *See also* Tex.Bus. & Com. § 1.201(37)(B) & (C).

The factors discussed in *Edison Brothers* clearly support the conclusion that the agreements are true leases. Here, the agreements contain no purchase option at the end of the leases. The leases are only for one year, with an option to renew for successive one-year terms. It is clear that the aggregate rental payments do not equal the original cost of the facilities (which was over $42 million). These factors a conclusion that the agreements are true leases. *See* Tex.Bus. & Com. § 1.201(37)(B) & (C)(iii) & (iv).

Nor does the lease term (1 year) cover the useful life of the facilities. In *International Trade Admin. v. Rensselaer Polytechnic Inst.*, for example, the Court held the unusually lengthy 99–year term of the lease favored concluding that the contract was a financing agreement rather than a true lease. 936 F.2d 744, 749 (2d Cir. 1991). *See also In re Moreggia & Sons, Inc. (City of San Francisco Market Corp. v. Walsh )*, 852 F.2d 1179, 1184 (finding that the parties did not intend to enter into a typical lease agreement because, in part, the "lease" at issue was for fifty year use rights). *See also* Tex.Bus. & Com. § 1.201(37)(B)(i). The fact that these agreements were for a term of only one

year, with a right to renew for additional terms of one year, clearly favors a finding that the agreements were true leases.

No evidence was presented that the monthly payments were calculated to ensure a return on an investment. Rather, Daniel C. Booth, Vice President of Finance of the Debtors, testified that at the time the loan was made the amount of rent was a reasonable market rental. Thus, this factor supports a conclusion the agreements were true leases. *See, e.g., PCH Assoc.,* 804 F.2d at 200–01; *In re KAR Dev. Assoc., L.P.,* 180 B.R. 629, 639 (D.Kan.1995).

The Debtors rely upon the fact that the agreement at issue is a triple net lease (*i.e.,* the lessee pays all costs related to the premises including the mortgage, taxes, and utilities). The Debtors argue that this is an indication of a financing arrangement because it requires the tenant to assume the usual obligations of ownership. However, a triple net lease is not an unusual term in a true lease. *See, e.g., Westship v. Trident Shipworks,* 247 B.R. at 863; *In re Lansing Clarion Ltd. Partnership,* 132 B.R. 845, 852 (Bankr.W.D.Mich.1991). *See also* Tex.Bus. & Com. § 1.201(37)(C)(ii).

The Subsidiaries clearly purchased the properties for Acquisition's use, not their own. This factor favors a finding that the leases between the parties are financing arrangements. *See, e.g., PCH Assoc.,* 804 F.2d at 200–01; *In re Winston Mills, Inc.,* 6 B.R. 587, 598 (Bankr.S.D.N.Y.1980). Ultimately, however, that is the only factor which favors such a conclusion.

The last factor is the parties' intent in structuring the agreements as they did, including whether the agreement was structured to secure tax advantages. We are unable to make any determination of how the leases fit into the entire transaction based upon the parties' intent. The only witness that the Debtors produced was Mr. Booth. Although Mr. Booth was the signatory to the loan documents and the leases on behalf of both the Subsidiaries and Acquisition, he stated that he was not involved in structuring the deal. Mr. Booth testified that the person who negotiated the deal, Robert Fishman, left the Debtors' employ over a year ago. Therefore, no credible testimony was presented as to the "intent" of the parties.

Further, Ms. McDonald, SouthTrust's vice president of specialized healthcare lending, who negotiated the loan for SouthTrust, testified that she had no idea that the Debtors intended the leases between the Subsidiaries and Acquisition to be financing arrangements. She testified that SouthTrust lent to the Debtors in reliance on the leases being true leases.

Finally, the documents themselves do not support the Debtors' position. The Debtors signed documents titled "Leases" which permitted the lessee, Acquisition, to use the facilities for one year in exchange for a base rent which equaled the market value for use of the facilities. At the end of the one year term, the lessee retained no right other than the right to renew for another year on similar terms. At no point did the lessee have the right to purchase the facilities for any amount.

Upon an evaluation of all of the factors discussed herein, we find that the Debtors have not overcome the strong presumption that the agreements at issue are true leases rather than financing devices. *See PCH Assoc.,* 804 F.2d at 200. We therefore conclude that section 365(d)(3) is applicable, and if the Debtors seek to maintain possession of the facilities, they must pay all post-petition rent under those leases.

## IV. CONCLUSION

Because SouthTrust is oversecured and there is no evidence its collateral is depre-

ciating in value, we deny SouthTrust's Motion for Relief from the Automatic Stay. We conclude that the agreements at issue are not financing arrangements but true leases. Acquisition is obligated to pay all post-petition rent pursuant to section 365(d)(3). SouthTrust, as assignee, is entitled to receive the post-petition rents due on each of the properties.

An appropriate order is attached.

### ORDER

AND NOW, this **13TH** day of **MARCH, 2001,** upon consideration of the Motion of SouthTrust Bank, N.A. for relief from the automatic stay or for adequate protection payments, for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that the motion to lift the automatic stay is **DENIED;** and it is further

**ORDERED** that SouthTrust's motion to compel the Debtors to make adequate protection payments is **GRANTED** pursuant to 11 U.S.C. § 365(d)(3); and it is further

**ORDERED** that Acquisition shall make all post-petition rent payments due under the leases with the Subsidiaries since March, 2000, directly to SouthTrust.